COURT OF APPEALS OF VIRGINIA


Present: Judges Willis, Bray and Annunziata
Argued at Norfolk, Virginia


ALLIANCE TO SAVE THE MATTAPONI, CHESAPEAKE
 BAY FOUNDATION, INC., MATTAPONI AND
 PAMUNKEY RIVERS ASSOCIATION, SIERRA CLUB,
 PAULETTE BERBERICH AND WARREN MOUNTCASTLE
                                        OPINION BY
v.   Record No. 2310-98-1        JUDGE ROSEMARIE ANNUNZIATA
                                        OCTOBER 5, 1999
COMMONWEALTH OF VIRGINIA, ex rel.
 STATE WATER CONTROL BOARD
 AND CITY OF NEWPORT NEWS


        FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                    Robert W. Curran, Judge

        Katherine E. Slaughter (Southern
        Environmental Law Center, on briefs), for
        appellant.

        Deborah L. Feild, Assistant Attorney General
        (Mark L. Earley, Attorney General; Roger L.
        Chaffe, Senior Assistant Attorney General,
        on brief), for appellee Commonwealth of
        Virginia, ex rel. State Water Control Board.

        M. Scott Hart (James E. Ryan, Jr.; George A.
        Somerville; Matthew M. Farley; Stuart E.
        Katz, City Attorney; Allen L. Jackson,
        Deputy City Attorney; Mays & Valentine, on
        brief), for appellee City of Newport News.


     Four organizations and two individuals ("appellants") appeal

the circuit court's ruling that they lacked standing to challenge

the decision of the State Water Control Board ("Board") to grant a

Virginia Water Protection Permit ("VWPP") to the City of Newport

News ("the City"). Appellants contend they have standing under

either Code § 62.1-44.29 of the State Water Control Law ("SWCL")

or Code § 9-6.14:16 of the Virginia Administrative Process Act ("VAPA"). The Board and the City respond on multiple grounds, collectively arguing that: (1) neither the SWCL nor the VAPA establishes a waiver of sovereign immunity enjoyed by the Board's decision to grant a VWPP; (2) appellants lack standing under the SWCL because they have not suffered "actual or imminent injury" and any such injury is not traceable to the Board's decision; (3) the organizational appellants representing the interests of their members do not have standing under the SWCL because representational standing has not been specifically authorized by statute; and (4) appellants lack standing under the VAPA because they are not "parties aggrieved" by the Board's decision to issue the VWPP.

We hold that the SWCL waives the Board's sovereign immunity from suit but that appellants lack standing to challenge the Board's action in granting the City a VWPP. Accordingly, we affirm the decision of the circuit court.

I.

FACTUAL BACKGROUND

In July 1993, the City applied to the Board for a VWPP for its proposed King William Reservoir water supply project. The King William Reservoir project is a regional undertaking sponsored by a coalition of local governments, including Newport News, Williamsburg and York County, for the purpose of identifying and developing a regional water supply to meet projected needs through

- 2 -

the year 2040.  Once completed, the reservoir will comprise a 1,526 acre impoundment created by a new dam across Cohoke Creek, a small tributary of the Pamunkey River located between the Pamunkey and Mattaponi Rivers in King William County.  The project will also entail the construction of a water intake and pumping station to withdraw water from the nearby Mattaponi River and convey it to the reservoir.

Because the dam will be constructed by "the discharge of dredged or fill material" into Cohoke Creek, § 404 of the federal Clean Water Act ("CWA") requires the City, as the lead agency of the coalition governments, to obtain a construction permit from the United States Army Corps of Engineers ("Corps").  See 33 U.S.C. § 1344(a),(d).  Under § 401(a) of the CWA, the Corps may not issue a permit for an activity resulting in a discharge into wetlands unless the state where the discharge takes place certifies that the discharge will comply with "applicable provisions" of the CWA or until the state waives such certification.[1]  See 33 U.S.C. § 1341(a)(1).

The Corps may not issue a permit "if certification has been denied by the [s]tate . . . ."  Id.  Furthermore, under § 401(d) of the CWA, "any effluent limitations and other limitations, and monitoring requirements" that are included in the state's

---

[1] The state certification requirements of § 401 "shall be waived" if the state "fails or refuses to act on [the Corps'] request for certification" within a year of receipt of such request.  See 33 U.S.C. § 1341(a)(1).

certification "shall become a condition on any Federal license or permit . . . ."  33 U.S.C. § 1341(d).

Code § 62.1-44.15(5) of the SWCL authorizes the Board to issue certificates for the alteration of the physical, chemical or biological properties of state waters.  The SWCL further designates the VWPP as "the certification required under Section 401" of the CWA.  Code § 62.1-44.15:5(A).  "The Board shall issue a [VWPP] for an activity requiring § 401 certification if it has determined that the proposed activity is consistent with the provisions of the [CWA] and will protect instream beneficial uses."  Code § 62.1-44.15:5(B).  "Conditions contained in a [VWPP] may include, but are not limited to, the volume of water which may be withdrawn as a part of the permitted activity."  Id.

On December 16, 1997, the Board issued a VWPP to the City. The VWPP contained a number of "Special Conditions" establishing various limitations and monitoring requirements for the project. For example, the VWPP requires the City to develop a monitoring plan designed to analyze the impact of the project on the Mattaponi River's salinity.  The permit also sets forth conditions requiring the reservoir to release a minimum amount of water below the dam on Cohoke Creek and authorizing the withdrawal of up to seventy-five million gallons of water per day from the Mattaponi River.

Subsequently, the City, the Mattaponi Tribe and appellants, a group of petitioners consisting of the Alliance to Save the

- 4 -

Mattaponi, the Chesapeake Bay Foundation, the Mattaponi and Pamunkey Rivers Association, the Sierra Club, Paulette Berberich and Warren Mountcastle, appealed the Board's decision. Both the Board and the City demurred to appellants' petition for appeal on grounds substantially similar to those raised before this Court.[2] At the parties' request, the circuit court heard oral argument on both demurrers at the same time, sustaining the demurrers on August 7, 1998 in a document entitled "Case Under Advisement." Without elaborating upon the grounds for its decision, the court wrote that appellants "lack standing to maintain [their] suit." The court disagreed, however, with the Board's position that appellants' suit was barred by the doctrine of sovereign immunity. The court entered a final order dismissing appellants' appeal on September 11, 1998. This appeal followed.

---

[2] Collectively, the parties alleged on demurrer: (1) appellants lacked standing under the VAPA because they were not parties to the Board's decision; (2) appellants lacked standing under Code § 62.1-44.29 of the SWCL because they have not suffered actual or imminent injury since the City cannot proceed with the project unless and until it receives a permit from the Corps; (3) appellants lacked standing under Code § 62.1-44.29 because their injuries, if any existed, would not be traceable to the Board's decision because the project may not proceed unless the Corps issues a permit; and (4) the organizational parties to appellants' appeal lacked standing because they alleged no injury of their own and cannot rely on their members' injuries to sue in a "representational capacity" in Virginia. The Board also argued that appellants' appeal was barred by the doctrine of sovereign immunity.

SOVEREIGN IMMUNITY

The Board contends that the doctrine of sovereign immunity bars appellants' appeal to the circuit court because neither the SWCL nor the VAPA explicitly waives such immunity. We disagree, finding an express waiver of immunity in the provisions of the SWCL.

Code § 62.1-44.15:5 establishes that a VWPP "shall constitute the certification required under § 401 of the [CWA]." Although Code § 62.1-44.15:5 makes no mention of judicial review, Code § 62.1-44.29 expressly waives the sovereign immunity enjoyed by the Board's grant or denial of a VWPP on the ground that a VWPP is a permit for the alteration of state waters within the scope of that statute's waiver.

Code § 62.1-44.15(5) gives the Board authority:

> [t]o issue certificates for the discharge of sewage, industrial wastes and other wastes into or adjacent to or the alteration otherwise of the physical, chemical or biological properties of state waters under prescribed conditions and to revoke or amend such certificates.

Code § 62.1-44.15(5) (emphasis added).

We hold that the VWPP for the King William Reservoir project is a certificate for the alteration of state waters constituting Cohoke Creek and the Mattaponi River. See Code § 62.1-44.15(5). The VWPP certifies that the discharge of fill material into Cohoke Creek complies with the CWA. The VWPP also contains a number of

conditions relating to the operation of the proposed reservoir that will directly affect the water levels of Cohoke Creek and the Mattaponi River and which, under federal law, must be incorporated into any permit subsequently issued by the Corps under § 404 of the CWA. See 33 U.S.C. § 1341(d). Furthermore, the Board's regulations confirm that a VWPP is a permit for the alteration of state waters. See 9 VAC § 25-210-50(A) (stating that "[n]o person shall dredge, fill or discharge any pollutant into, or adjacent to surface waters, or otherwise alter the physical, chemical or biological properties of surface waters, except as authorized pursuant to a [VWPP] . . ." (emphasis added)). Because the VWPP for the King William Reservoir is a permit for the alteration of state waters, we hold that Code § 62.1-44.29, by reference to the Board's authority under Code § 62.1-44.15(5), expressly waives the Board's sovereign immunity as to the grant of that permit.

Code § 62.1-44.29 authorizes judicial review of "final decision[s]" made by the Board under Code § 62.1-44.15(5).[3] We

_____

[3] Code § 62.1-44.29 states in pertinent part:

> Any owner aggrieved by, or any person who has participated . . . in the public comment process related to, a final decision of the Board under §§ 62.1-44.15(5), 62.1-44.15(8a), (8b), and (8c), 62.1-44.16, 62.1-44.17, 62.1-44.19 or § 62.1-44.25, whether such decision is affirmative or negative, is entitled to judicial review thereof in accordance with the provisions of the Administrative Process Act . . . .

Code § 62.1-44.29 (emphasis added).

find the language of Code § 62.1-44.29 to be clear and the scope of judicial review established therein to be unambiguously defined. Broadly inclusive language in a statute is not ambiguous if the legislature's objective requires such language. See Diggs v. Commonwealth, 6 Va. App. 300, 302, 369 S.E.2d 199, 200 (1988). As such, judicial construction is not required, and we will not resort to legislative history or extrinsic facts to endow the statute with its meaning. See id. Instead, we take the statute's words as they are written and give them their plain meaning. See id.

The Board contends that Code § 62.1-44.29 should not be construed to allow judicial review of VWPP decisions because it fails to separately and explicitly identify the precise type of permit at issue in this case. In support of this argument the Board notes that, while Code § 62.1-44.29 states that judicial review is available for final decisions made pursuant to the general authorization in Code § 62.1-44.15(5), the statute then identifies specific types of permitting decisions under other code sections which are to be afforded such review. See Code § 62.1-44.29 (authorizing judicial review of final decisions under Code §§ 62.1-44.16, 62.1-44.17 and 62.1-44.19). The Board reasons that, because the code section providing for the issuance of a VWPP, Code § 62.1-44.15:5, is not specifically mentioned, judicial review is limited to decisions made pursuant to the specific permitting actions cited in Code § 62.1-44.29. We disagree.

First, we find no authority in support of the principle advanced by the Board that Code § 62.1-44.29 must separately and explicitly identify the precise type of permit at issue in order for its legislative waiver of sovereign immunity to be effective as to that permitting action, particularly where the statutory language providing for judicial review is otherwise clear. Indeed, we declined to require such specificity in Virginia Bd. of Medicine v. VPTA, 13 Va. App. 458, 413 S.E.2d 59 (1991), where we found an "explicit and limited waiver of sovereign immunity" in general statutory language providing that "'[a]ny person affected by . . . any [regulation]'" or any "'party aggrieved by . . . a case decision'" has the right to judicial review against the agency promulgating the regulation or case decision at issue. Id. at 465-66, 413 S.E.2d at 64 (quoting Code § 9-6.14:16(A)). Furthermore, the Board's construction effectively negates the express language of Code § 62.1-44.29 providing for judicial review of final decisions made under Code § 62.1-44.15(5). See Commonwealth v. Hawkins, 10 Va. App. 41, 44, 390 S.E.2d 3, 5 (1990) (stating that statutes "must be read so as to give effect to the plain meaning of all of [their] terms").

Second, the premise underlying the Board's position does not withstand scrutiny. The Board argues that if the legislature had intended to establish judicial review for final decisions encompassed within the "general" language of Code § 62.1-44.15(5), there would be no need to include the specific and redundant

references to Code §§ 62.1-44.16, 62.1-44.17 and 62.1-44.19.  They

contend that by giving the general language of Code

§ 62.1-44.15(5) effect, the legislature's inclusion of the

specific references is made "an unnecessary and duplicative act."

However, a close examination of Code § 62.1-44.29 makes

manifest that the specific references address final decisions by

the Board that are separate and distinct from those made under

Code § 62.1-44.15(5).  Code § 62.1-44.15(5) authorizes the Board

to issue certificates for the discharge of industrial wastes,

other wastes and sewage or for the alteration of state waters by

other means.  Code § 62.1-44.17 authorizes the Board:  (1) to

require the installation of facilities or the adoption of

appropriate measures necessary to prevent the discharge of "other

wastes" into state waters and (2) to issue certificates for the

"handling, storing, distribution or production" of other wastes.[4]

_____

[4] Code § 62.1-44.17(1) states in pertinent part:

> Any owner who handles, stores, distributes,
> or produces other wastes as defined in
> § 62.1-44.3, any owner who causes or permits
> same to be handled, stored, distributed or
> produced or any owner upon or in whose
> establishment other wastes are handled,
> stored, distributed or produced shall upon
> request of the Board install facilities
> approved by the Board or adopt such measures
> approved by the Board as are necessary to
> prevent the escape, flow or discharge into
> any state waters when the escape, flow or
> discharge of such other wastes into any state

Although Code §§ 62.1-44.16 and 62.1-44.19 authorize the Board to issue certificates for the discharge of wastes into state waters, they also authorize the Board to make decisions that do not involve the issuance of certificates for the discharge of wastes or for the alteration of state waters.  Specifically, Code § 62.1-44.16 gives the Board the authority, inter alia, to approve facilities for the treatment as well as the control of industrial wastes and other wastes.[5]  Code § 62.1-44.19 authorizes the Board, inter alia, to certify the construction, expansion or operation of a sewerage system or sewage treatment works and to determine

---

> waters would cause pollution of such state
> waters.

Code § 62.1-44.17(1).

[5] Code § 62.1-44.16(1) states in pertinent part:

> Any owner who erects, constructs, opens,
> reopens, expands or employs new processes in
> or operates any establishment from which
> there is a potential or actual discharge of
> industrial wastes or other wastes to state
> waters shall first provide facilities
> approved by the Board for the treatment or
> control of such industrial wastes or other
> wastes.
>     Application for such discharge shall be
> made to the Board[, which, upon approval of
> the application,] shall grant a certificate
> for the discharge of the industrial wastes
> or other wastes into state waters or for the
> other alteration of the physical, chemical
> or biological properties of state waters
> . . . .

Code § 62.1-44.16(1).

minimum treatment requirements.[6]  See 9 VAC 25-32-10; 9 VAC

25-32-30(C); 9 VAC 25-32-60(A)(2) (authorizing the Board, pursuant

to the statutory authority of Code §§ 62.1-44.16, 62.1-44.17 and

62.1-44.19, to issue Virginia Pollution Abatement permits for

"pollutant management activities," which include the operation of

systems for the prevention, reduction, storage, treatment,

separation, disposal, recycling or reclamation of wastes).

Indeed, as their captions suggest, the waste statutes

generally include provisions for the treatment of wastes and for

the regulation of the facilities where wastes are stored or

produced.  See Code §§ 62.1-44.16, 62.1-44.17 (entitled

"Regulation of Industrial Establishments"); Code § 62.1-44.19

(entitled "Regulation of Sewage Discharges").  See also Hawkins v.

Commonwealth, 255 Va. 261, 269, 497 S.E.2d 839, 842 (1998)

_____

[6] Code § 62.1-44.19 states in pertinent part:

> A.  Before any owner may erect,
> construct, open, expand or operate a sewerage
> system or sewage treatment works which will
> have a potential discharge or actual
> discharge to state waters, such owner shall
> file with the Board an application for a
> certificate in scope and detail satisfactory
> to the Board.
> B.  If the application involves a system
> or works from which there is or is to be a
> discharge to state waters, . . . [t]he Board
> shall approve such application if it
> determines that minimum treatment
> requirements will be met and that the
> discharge will not result in violations of
> water quality standards.

Code § 62.1-44.19 (emphasis added).

- 12 -

(stating that a title "may be read in an attempt to ascertain an act's purpose").

Thus, the legislature's authorization of judicial review for decisions made under Code §§ 62.1-44.16, 62.1-44.17 and 62.1-44.19, in addition to the class of decisions encompassed within 62.1-44.15(5), is not redundant.  See Code § 62.1-44.29.  Rather, the language is necessary to address comprehensively the different decision-making authority granted to the Board under the SWCL.

In summary, we hold that Code § 62.1-44.29 explicitly provides for judicial review of the Board's decision to issue a permit for the alteration of state waters.  Because the VWPP for the King William Reservoir project is such a permit, the doctrine of sovereign immunity does not bar appellants' suit.[7]

---

[7] The Board also contends our recent decision in May Dep't Stores v. Commonwealth, Dep't of Environmental Quality is relevant to our disposition of this case.  29 Va. App. 589, 513 S.E.2d 880 (1999).  However, we find our decision in May to be inapposite.  In May, we held that "where an agency's basic law provides expressly for VAPA coverage of certain proceedings under specified conditions and makes no provision for judicial review of other proceedings, the unmentioned proceedings are subject to the VAPA unless otherwise expressly excluded."  Id. at 594, 513 S.E.2d at 882.  Unlike May, in this case the basic law provides expressly for judicial review of the agency action at issue.  As such, we need not look to the provisions of the VAPA for a waiver of sovereign immunity.  Nor do we rely on the provisions of the VAPA to analyze whether appellants have standing.  See Code § 9-6.14:3 (stating that the VAPA "does not supersede or repeal additional procedural requirements in" an agency's basic law).

III.

STANDING

Having established that the SWCL provides for a waiver of the Board's sovereign immunity from judicial review of its decision to grant or deny a VWPP, we must now determine whether appellants have standing to challenge the decision at issue.

The SWCL provides that any person who has participated, either in person or by the submission of written comments, in the public comment process related to a final decision of the Board under Code § 62.1-44.15(5) is entitled to judicial review of that decision "if such person meets the standard for obtaining judicial review of a case or controversy pursuant to Article III of the United States Constitution."  Code § 62.1-44.29.

> A person shall be deemed to meet such standard if (i) such person has suffered an actual or imminent injury which is an invasion of a legally protected interest and which is concrete and particularized; (ii) such injury is fairly traceable to the decision of the Board and not the result of the independent action of some third party not before the court; and (iii) such injury will likely be redressed by a favorable decision by the court.

Id.

Appellants contend they have standing to challenge the Board's grant of a VWPP to the City because they meet the three-part test for Article III standing enunciated in Code

- 14 -

§ 62.1-44.29.[8] We find that, under the statutes and regulations applicable to the proposed reservoir project, the Army Corps of Engineers must grant a § 404 permit for the discharge of fill material into Cohoke Creek before construction of the King William Reservoir project may proceed. Accordingly, we hold that appellants do not have standing under Code § 62.1-44.29 to challenge the Board's issuance of a VWPP because the injuries alleged in their petition for appeal will result from the independent action of the Corps, a third party not before the circuit court. In light of this holding, the remaining arguments of the Board and the City are rendered moot, and we will not address them.

The CWA establishes a comprehensive program to restore and maintain the chemical, physical and biological integrity of the waters of the United States. See 33 U.S.C. § 1251(a); Route 26 Land Development Assoc. v. United States Government, 753 F. Supp.

---

[8] Appellants filed affidavits with their petition for appeal in which each appellant represented that the King William Reservoir project will inflict injury upon it or its individual members. Members of the Alliance to Save the Mattaponi, the Chesapeake Bay Foundation ("CBF"), the Mattaponi and Pamunkey Rivers Association, and the Sierra Club contend the construction of the reservoir and subsequent withdrawal of water from the Mattaponi River will harm them by damaging the ecosystems and the aesthetic qualities of the Mattaponi River and Cohoke Creek, which they use for boating, fishing, swimming, water supply, and educational purposes. Paulette Berberich alleges the reservoir will flood fifteen to twenty acres of land that she owns, resulting in her loss of use and enjoyment of that land. Warren Mountcastle, a landowner on the Mattaponi River, alleges the project will harm his use, enjoyment, and economic value of his real property due to the placement of an intake pipe nearby.

- 15 -

532, 536 (D. Del. 1990), aff'd, 961 F.2d 1568 (1992).  Pursuant to §§ 401 and 404 of the CWA, the Corps is authorized to issue permits for the discharge of dredged or fill material into the waters of the United States after obtaining a certification from the state where the discharge originates that any such discharge will comply with the CWA.  See 33 U.S.C. §§ 1341(a)(1), 1344(a).  Although the certifying state may prevent the Corps from issuing a § 404 permit by denying the certification required by the CWA or may issue a certification with limitations that become conditions on any § 404 permit issued by the Corps, only the Corps, by issuance of a § 404 permit, has the power to authorize an actual discharge into the waters of the United States.  See 33 U.S.C. §§ 1341(a)(1), 1341(d).  Indeed, in the absence of a state's timely action "on a request for certification," the Corps is authorized to proceed with a permitting action without the state's certification.  See 33 U.S.C. § 1341(a)(1).

Rules regarding the Corps' authority to issue § 404 permits are codified at 33 C.F.R. Parts 230, 320 and 323.  Part 230 establishes guidelines to implement the policies of the CWA "through the control of discharges of dredged or fill material." 33 C.F.R. § 230.1(a),(b).  The guidelines are "applicable to the specification of disposal sites for discharges of dredged or fill material into waters of the United States," 33 C.F.R. § 230.2(a), and establish "conditions which must be satisfied in order to make a finding that a proposed discharge of dredged or fill material

- 16 -

complies with" the CWA. 33 C.F.R. § 230.4. Part 320 contains the

Corps' general policies for evaluating all applications for

permits. See 33 C.F.R. § 320.4. See also Route 26 Land

Development, 753 F. Supp. at 536. Part 323 contains additional

policies, practices and procedures specifically applicable to the

Corps' "review of applications for . . . permits to authorize the

discharge of dredged or fill material into waters of the United

States pursuant to section 404 of the [CWA]." 33 C.F.R. § 323.1.

According to these rules and policies, the Corps "is neither

a proponent nor opponent of any permit proposal" and bases its

permitting decisions on a "public interest review." 33 C.F.R.

§ 320.1(a)(1),(4). The Corps may issue or deny a permit based on

its assessment of whether "the proposed activity and its intended

use" is in the public interest. See 33 C.F.R. § 320.4(a)(1).

> The decision whether to issue a permit will
> be based on an evaluation of the probable
> impacts, including cumulative impacts, of the
> proposed activity and its intended use on the
> public interest. Evaluation of the probable
> impact which the proposed activity may have
> on the public interest requires a careful
> weighing of all those factors which become
> relevant in each particular case. The
> benefits which reasonably may be expected to
> accrue from the proposal must be balanced
> against its reasonably foreseeable
> detriments. The decision whether to
> authorize a proposal, and if so, the
> conditions under which it will be allowed to
> occur are therefore determined by the outcome
> of this general balancing process.

33 C.F.R. § 320.4(a)(1) (emphasis added). As to § 404 permits for

the discharge of dredged or fill material, Part 323 specifically

provides that the Corps will review such applications and, if it "determines that the proposed discharge would comply with the [Guidelines], . . . grant the permit unless issuance would be contrary to the public interest." 33 C.F.R. § 323.6(a). Factors that the Corps must balance in making its public interest determination include, <u>inter</u> <u>alia</u>, "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, . . . recreation, water supply and conservation, water quality, . . . considerations of property ownership, and, in general, the needs and welfare of people." 33 C.F.R. § 320.4(a)(1).

As the foregoing regulations make clear, the Corps ultimately authorizes the discharge of fill material into Cohoke Creek after consideration of numerous factors, including some which are co-incident with those considered by the Board in issuing a VWPP. <u>Compare</u> Code § 62.1-44.15:5 (stating that the Board "shall issue" a VWPP "if it has determined that the proposed activity is consistent with the provisions of the [CWA] and will protect instream beneficial uses," which include navigation, maintenance of waste assimilation capacity, the protection of fish and wildlife resources and habitat, recreation, cultural and aesthetic values), <u>with</u> 33 C.F.R. § 323.6(a) (stating that the Corps shall issue a § 404 permit if it determines that the proposed discharge

- 18 -

complies with the Guidelines and comports with the public interest).

Moreover, we cannot say that the Board's issuance of a VWPP has a "determinative or coercive effect" on the Corps' ultimate decision to issue a § 404 permit for the King William Reservoir project. See Bennett v. Spear, 520 U.S. 154, 169 (1997). In Spear, the United States Supreme Court found that an injury was fairly traceable to a biological opinion of the Fish and Wildlife Service, notwithstanding the fact that the Service's opinion was not "the very last step in the chain of causation," based on the opinion's coercive effect on the ultimate decision-making agency.[9] See id. The Court based its decision, however, on several factors not present here. In Spear, the statutory scheme: (1) placed a heavy burden on an agency that disagreed with the Service's

_____

[9] In Spear, the Bureau of Reclamation notified the Service that an irrigation project it administered might affect two endangered species of fish. See id. at 158-59. In accordance with the Endangered Species Act, the Service issued a biological opinion, concluding that the operation of the project was likely to jeopardize the species and identifying an alternative method of operation. See id. at 159. Several petitioners challenged the opinion, contending that the Bureau would abide by the restrictions imposed therein and that these restrictions would substantially reduce the quantity of available irrigation water. See id. at 167. The Government responded that petitioners failed to meet the requirements of Article III standing, particularly the requirement that their injuries be "fairly traceable" to the Service's opinion. See id. at 168. The Government contended that petitioners' injuries were traceable to the Bureau's ultimate implementation of the opinion, not to the opinion itself. See id. The Court disagreed, holding that petitioners' injuries were fairly traceable to the opinion based on its "powerful coercive effect on the [Bureau] . . . ." Id. at 169.

opinion to articulate its reasons, (2) raised wildlife issues for review that were beyond the Bureau's sphere of expertise and which were peculiarly within the Service's expertise and (3) imposed the risk of civil and criminal penalties upon agencies and their employees who chose to disregard an opinion's terms.

In this case, although 33 C.F.R. § 320.4 states that the Corps "will generally . . . issue[]" a permit upon receipt of "a favorable state determination," the remaining regulatory provisions make clear that the Corps independently reviews whether a § 404 permit would comport with the public interest and that numerous factors must be considered by the Corps before a permit can issue.  Furthermore, we note the absence of any provisions imposing penalties on the Corps should it elect to deny a § 404 permit after receiving the required state certification and the relative expertise enjoyed by the Corps in reviewing the relevant issues to be addressed before a permit may be issued.  See 33 U.S.C. § 1344(a),(d) (authorizing the Secretary of the Army, "acting through the Chief of Engineers," to issue permits for the discharge of dredged or fill material); 33 C.F.R. § 323.1 (establishing "policies, practices, and procedures to be followed by the Corps of Engineers in connection with the review of . . . permits [for] the discharge of dredged or fill material into waters of the United States . . .").  Further, as expressly established in 33 C.F.R. § 320.4, the general statement that the Corps will issue a permit upon receipt of a favorable state

determination applies only "in the absence of overriding national factors of the public interest that [are] revealed during the evaluation of the permit application" and only if the "concerns, policies, goals, and requirements as expressed in 33 C.F.R. Parts 320-24, and the applicable statutes have been considered and followed."  These factors underscore the independent nature of the Corps' review of permit applications and the absence of a coercive or determinative effect of a state certification upon the process.

In summary, the construction and operation of the King William Reservoir project is contingent upon the Corps' issuance of a § 404 permit for the discharge of fill material into Cohoke Creek.  Under the applicable statutory scheme, the Corps has exclusive authority to issue such a permit upon finding that the project and its intended use comply with the guidelines implementing the policies of the CWA and comport with the public interest.  The Board's issuance of a VWPP does not compel the Corps to issue a § 404 permit.  Thus, we hold that appellants' alleged injuries are the result of the independent action of the Corps upon its authorization of the discharge of fill material into Cohoke Creek pursuant to § 404 of the CWA.  As such, appellants have failed to satisfy the second prong of the test for standing established in Code § 62.1-44.29.

For the foregoing reasons, we affirm the decision of the circuit court.

<u>Affirmed.</u>