Present: Carrico, C.J., Lacy, Keenan, Koontz, and Kinser, JJ., and Compton, S.J.

MATTAPONI INDIAN TRIBE, ET AL.

v. Record No. 000509

COMMONWEALTH OF VIRGINIA,
DEPARTMENT OF ENVIRONMENTAL QUALITY,
EX REL. STATE WATER CONTROL
BOARD, ET AL.

OPINION BY
SENIOR JUSTICE A. CHRISTIAN COMPTON
March 2, 2001

ALLIANCE TO SAVE THE
MATTAPONI, ET AL

v. Record No. 992575

COMMONWEALTH OF VIRGINIA,
EX REL. STATE WATER CONTROL
BOARD, ET AL.

FROM THE COURT OF APPEALS OF VIRGINIA

In this environmental litigation arising under laws dealing with the quality of state waters, the sole question presented in these appeals is whether certain protesters to state action have standing to seek judicial review of such action in a state court.

In July 1993, the City of Newport News applied to the State Water Control Board (the Board) for a Virginia Water Protection Permit (the state permit) for the City's proposed King William Reservoir public water supply project. This application was filed pursuant to § 401 of the federal Clean Water Act (the federal Act), 33 U.S.C. § 1341, and Va. Code § 62.1-44.15:5, a

part of the State Water Control Law, Code §§ 62.1-44.2 through -44.34:28 (the Virginia Act).  The Board issued the state permit to be effective in December 1997 for a term of ten years.

In February 1998, two proceedings seeking review of the Board's decision were instituted in the Circuit Court of the City of Newport News by petitions in chancery filed in accordance with Rule 2A:4.  In one proceeding, the petitioners included four organizations and two individual riparian owners, that is, Alliance to Save the Mattaponi; Chesapeake Bay Foundation, Inc; Mattaponi and Pamunkey Rivers Association; Sierra Club; Paulette P. Berberich, and Warren Mountcastle (hereinafter collectively, the Alliance).  Respondents in that proceeding included the Commonwealth of Virginia, ex rel. State Water Control Board, and the City of Newport News.  The other proceeding was instituted by The Mattaponi Indian Tribe, Carl T. Lone Eagle Custalow, Assistant Chief (hereinafter, the Tribe), against the Board and the City.

The circuit court sustained demurrers filed by the Board and the City, and entered final judgments against the Alliance and the Tribe dismissing the proceedings for lack of standing to sue.

Subsequently, the Court of Appeals of Virginia affirmed the judgments of the circuit court in separate appeals.  Alliance to Save the Mattaponi v. Commonwealth, 30 Va. App. 690, 519 S.E.2d

2

413 (1999), and Mattaponi Indian Tribe v. State Water Control Board, 31 Va. App. 472, 524 S.E.2d 167 (2000). Among other rulings, the Court of Appeals decided that the Alliance and the Tribe lacked standing to institute the circuit court proceedings.

In these cases originating before an administrative agency, we determined that the decisions of the Court of Appeals involve matters of significant precedential value. See Code § 17.1-410(B). Thus, we took jurisdiction of the cases, awarded the Alliance and the Tribe separate appeals, and consolidated them for hearing upon the question of standing.

Because the circuit court decided the matters upon demurrer, we shall recite the facts alleged, and all reasonable inferences flowing from those facts, as though they are true, in accordance with settled principles of appellate review. There is very little difference between the respective allegations of the Alliance and the Tribe. Actually, the factual allegations merely serve as a background for resolution of a pure question of law.

The City's proposed King William Reservoir project is a regional undertaking sponsored by a coalition of local governments (York County and the Cities of Williamsburg and Newport News) that was formed to identify and develop a water supply to meet the region's long-term public water supply needs.

3

The project will also supply water to consumers in the Cities of Hampton and Poquoson, and the Counties of James City, King William, and New Kent. The City of Newport News acts for the coalition because the coalition has no corporate existence or authority to obtain permits or to build and operate a water supply system.

The project will include a water intake and pumping station on the Mattaponi River at Scotland Landing in King William County. Up to 75 million gallons of water per day (mgd) will be withdrawn from the River. The project will also involve a reservoir impoundment created by a new 78-foot-high dam on Cohoke Mill Creek, a tributary of the Pamunkey River located between the Pamunkey and Mattaponi Rivers. The dam, 1700 feet long, will cause the inundation of 437 acres of wetlands, 21 miles of perennial and intermittent streams, and 875 acres of upland wildlife habitat, and additional alteration of 105 acres of downstream wetlands — which allegedly will be harmful to fish and wildlife in the York River watershed. The Tribe asserts that of the many acres flooded in the Cohoke Mill Creek Valley, 532 acres will encroach upon lands reserved for use by the Tribe under a 1677 treaty.

Additionally, the project will include construction of two pipelines — one to convey water from the Mattaponi River to the

4

reservoir and another to carry water from the reservoir to the City's existing Diascund Creek Reservoir in New Kent County.

Because the dam will be constructed by a "discharge of dredged or fill material" into Cohoke Mill Creek, a construction permit (federal permit) from the United States Army Corps of Engineers (Corps) is required under § 404 of the federal Act, 33 U.S.C. § 1344(a). But § 401(a) of the federal Act provides that federal agencies may not issue permits for activities like this unless "a certification from the State in which the discharge originates or will originate" is provided. 33 U.S.C. § 1341(a).

Code § 62.1-44.15:5(A) provides that "issuance of a Virginia Water Protection Permit shall constitute the certification required under § 401 of the" federal Act. The statute further provides that the State Water Control Board shall issue such a state permit "for an activity requiring § 401 certification if it has determined that the proposed activity is consistent with the provisions of the [federal Act] and will protect instream beneficial uses." Code § 62.1-44.15:5(B).

The statute further declares: "The preservation of instream flows for purposes of the protection of navigation, maintenance of waste assimilation capacity, the protection of fish and wildlife resources and habitat, recreation, cultural and aesthetic values is a beneficial use of Virginia's waters." Id.

During consideration of the City's application, public hearings were held, environmental impact studies were conducted, and public comment was received by the Virginia Department of Environmental Quality and the Board. As we have said, the Board issued the state permit in December 1997. The permit authorized, with certain special conditions, the City to withdraw water from the Mattaponi River for the reservoir and certified that the proposed reservoir would meet all requirements of state law. To date, according to the allegations, the Corps has not issued a federal permit and, thus, the project has not been finally approved.

In the petitions filed in the circuit court, the Alliance and the Tribe made a number of allegations to support their conclusions that the state permit was issued contrary to law. They asked that the matters be remanded to the Board for reconsideration of its decision to grant the permit.

Initially, the petitions identified the several parties and their claimed injury in order to support their standing to sue. For example, the Alliance to Save the Mattaponi, a 1,100-member unincorporated association, claims that the permit allowing construction of the project "will threaten irrevocable harm to the ecosystems of the Mattaponi River and Cohoke Creek region — irreplaceable natural resources which its members use for boating, fishing, recreation and water supply." The Chesapeake

Bay Foundation, Inc., a Maryland nonprofit corporation and a "regional conservation organization with approximately 23,000 members residing in Virginia," claims that the project will "injure its members who regularly use and enjoy the Mattaponi River, a tributary of the Bay[,] for swimming, boating, kayaking, canoeing, sport fishing, hunting, beach walking, snorkeling, and other educational and recreational pursuits." The other two organizations make similar allegations of injury resulting from the decision to award the state permit.

Berberich alleges she is a landowner on Cohoke Mill Creek and will lose 15-20 acres of her property and possibly her home adjacent to the proposed reservoir. She also will be "harmed by loss of wildlife habitat on her land and her enjoyment of its use." Mountcastle, a riparian landowner on the Mattaponi River adjacent to the location of the water intake pipe, uses the river for swimming, fishing, hunting, and photography. He claims "his enjoyment of these uses would be injured by the location [of] the pipe and the noise from the intake."

The Tribe alleges it is a state-recognized tribe that maintains a sovereign government occupying Mattaponi Indian Town located along the Mattaponi River. Among other allegations, the Tribe claims that the project "directly injures" it "by sub[s]tantially interfering with the Tribe's capacity to continue to exist as a tribe as it has from since before

7

recorded history, will interfere with the Mattaponi's traditional way of life, and will prevent the Tribe from maintaining its cultural and spiritual connections to the Mattaponi River, Cohoke Mill Creek, together with its adjacent wetlands and adjacent archaeological sites, and Cohoke Mill Creek Valley."  Further, the Tribe asserts that the "project intake structure in the Mattaponi River will desecrate and insult the Mattaponi culture, dishonor the Tribe's ancestors, jeopardize the Tribe's historic dependence on the river for hunting and fishing, and impair the river's cultural and spiritual resources."

All of the foregoing parties participated, either in person or by comment, in the public comment process related to the decision to grant the state permit.

In the circuit court petitions, the petitioners assigned errors allegedly committed by the Board.  The Alliance generally asserts "that the Board refused to consider substantial evidence in the record relating to cultural and aesthetic instream beneficial uses; the reasonableness of the amounts of water withdrawal; and the impact of the water withdrawal, especially in relation to salinity intrusions and wetlands losses on water quality and instream beneficial uses. Thus, the Board erred as a matter of law in failing to follow

the requirements of the [federal] Act, the State Water Control Law, and the regulations promulgated under these statutes."

The Tribe, among other claims, generally asserts that the Board in issuing the state permit failed to consider and evaluate certain treaty rights, "cultural values and resources of the Mattaponi River and Cohoke Mill Creek, together with its associated wetlands and adjacent archaeological sites, in violation of Virginia State Water Law."

The Board's and the City's demurrers, insofar as pertinent to the issue presented in these appeals, relied upon a statute that is central to our ruling here, that is, Code § 62.1-44.29, a part of the Virginia Act governing judicial review of a final decision of the Board to issue a Virginia Water Protection Permit.[*]

As pertinent, § 62.1-44.29 provides that any owner aggrieved, or any person who has participated, in person or by submittal of written comments, in the public comment process

---

[*]In one of the cases on appeal here, the Court of Appeals decided that the foregoing statute, before its amendment in 2000, and other provisions of state law, contained a waiver of sovereign immunity from suit against the Board arising from issuance of the state permit. Alliance to Save the Mattaponi, 30 Va. App. at 696-701, 519 S.E.2d at 415-18. That issue was eliminated from this appeal by denial of the Board's assignment of cross-error. As amended in 2000, the statute now contains an express waiver of such immunity from suit against the Board arising from issuance of such a permit, as the result of insertion of "62.1-44.15:5" in the first sentence of § 62.1-44.29. Acts 2000, ch. 1032 at p. 2465; ch. 1054 at p. 2569.

9

related to a final decision of the Board to issue a Virginia Water Protection Permit is entitled to judicial review thereof if such person meets the standard for obtaining judicial review of a case or controversy under Article III of the United States Constitution.

The statute goes on to establish the criteria for standing that are at the core of these appeals:

> "A person shall be deemed to meet such standard if (i) such person has suffered an actual or imminent injury which is an invasion of a legally protected interest and which is concrete and particularized; (ii) such injury is fairly traceable to the decision of the Board and not the result of the independent action of some third party not before the court; and (iii) such injury will likely be redressed by a favorable decision by the court."

In its demurrers, the Board, among other contentions, asserted that the state permit does not, of itself, authorize the reservoir project, pointing out that the "permitting authority" for the project belongs to the Corps. According to the Board, any injury resulting to the Alliance or the Tribe from the project is as a result of the City's action following a decision made by the Corps. Therefore, said the Board, the protestants fail to meet the standing requirements of § 62.1-44.29.

In its demurrers, the City also attacks the protesters' standing to sue. Advancing arguments similar to those of the Board, the City contended the Alliance and the Tribe failed to

10

meet statutory criteria (i) (actual or imminent injury) and (ii) (causation).  The City said that any injury suffered is not caused by the Board's decision to issue the state permit, but only results from the Corps' decision to award a federal permit.

In sustaining the demurrers, the circuit court ruled without elaboration that the protesters lacked standing to maintain the suits.

Affirming the judgment of the circuit court in the Alliance suit, the Court of Appeals said that "the construction and operation of the King William Reservoir project is contingent upon the Corps' issuance of a § 404 permit for the discharge of fill material into Cohoke Creek."  Alliance to Save the Mattaponi, 30 Va. App. at 706, 519 S.E.2d at 421.  Continuing, the Court of Appeals noted that "[u]nder the applicable statutory scheme, the Corps has exclusive authority to issue such a permit upon finding that the project and its intended use comply with the guidelines implementing the policies of the [federal Act] and comport with the public interest.  The Board's issuance of a [state permit] does not compel the Corps to issue a § 404 permit."  Id. at 706-07, 519 S.E.2d at 421.

Therefore, the Court ruled, the protesters failed to satisfy the second prong of the statutory test for standing; it held that the protesters' "alleged injuries are the result of the independent action of the Corps upon its authorization of

11

the discharge of fill material into Cohoke Creek pursuant to § 404 of the [federal Act]."  Id. at 707, 519 S.E.2d at 421.

In affirming the circuit court's judgment in the Tribe's suit, the Court of Appeals adopted its reasoning in Alliance to Save the Mattaponi, and held that the Tribe also lacked standing to sue.  Mattaponi Indian Tribe, 31 Va. App. at 476-77, 524 S.E.2d at 169-70.

The central question for our decision then becomes:  Did the Court of Appeals err in holding that the protesters' alleged injuries are not "fairly traceable to the decision of the Board," but will be "the result of the independent action" of the Corps, a third party not before the circuit court?

On appeal, the Board and the City contend the Court of Appeals correctly affirmed the circuit court judgments.  The Board urges, "Manifestly, the petitioners have made no claim of injury that does not depend upon the award of the federal permit.  The State action does not compel or authorize the proposed Project; it merely allows the federal permitting process to proceed."  Asserting that any injury does not stem from the Board, it argues, "The alleged injuries will arise, if at all, from the Project.  The Corps of Engineers authorizes the Project and the City of Newport News will construct it."

The City urges that while § 401 of the federal Act "provides that federal permits cannot be issued without State

12

certification, . . . it does not require that a federal permit must be issued if the State does grant certification. Section 401 affords States the opportunity to veto or condition federal permits, but it gives the States no power to authorize a project over the objection of the federal permitting agency. The federal agency must conduct its own review and make its own decision, pursuant to applicable laws." Continuing, the City argues that if and when the Corps issues a permit to build the project, protesters can then litigate the issues raised here, because the project construction and any resulting injuries will then be "fairly traceable" to the Corps' decision.

We do not agree with either the Board or the City. We hold that the Alliance and the Tribe have standing under Code § 62.1-44.29, and that the Court of Appeals erred in ruling to the contrary.

The language of Code § 62.1-44.29 tracks the statements by the United States Supreme Court about standing requirements imposed by the "case" or "controversy" provisions of Article III of the U.S. Constitution. The standing doctrine requires (1) that the plaintiff has suffered an "injury in fact," an invasion of a judicially cognizable interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of, that is, the injury must

13

be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court; and (3) that it be likely, not merely speculative, the injury will be redressed by the court's favorable decision.  Bennett v. Spear, 520 U.S. 154, 167 (1997).

Pertinent to these appeals, the Supreme Court has said that the "fairly traceable" prong does not mean that "the defendant's actions are the very last step in the chain of causation." While there is no standing if the injury complained of is the result of "independent" action of some third party not before the court, that prong does not exclude injury produced by the effect of action of someone else.  Id. at 168-69.

However, "[w]hen the suit is one challenging the legality of government action . . . , the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action . . . at issue.  If he is, there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62 (1992).  But when a plaintiff's asserted injury arises from allegedly unlawful regulation of someone else, "much more is needed. . . . Thus, when the plaintiff is not himself the object of the government action . . . he challenges, standing is not precluded, but it is

14

ordinarily 'substantially more difficult' to establish." Id. at 562.

In the present appeals, we conclude that the injuries alleged by the Alliance and the Tribe meet the "causation" prong of the standing criteria, that is, the injuries alleged are "fairly traceable" to the decision of the Board to award the state permit, and are not the result of the independent action of the Corps, a third party not before the circuit court. In other words, there is a causal connection between the injuries and the conduct complained of.

The federal Act requires the state § 401 certification to ensure that the proposed activity will meet state water quality standards and applicable effluent limitations. 33 U.S.C. § 1341(a)(1). The Commonwealth uses the state permit as the vehicle for the § 401 certification.

The certification is issued if the proposed project "is consistent with the provisions of the [federal Act] and will protect instream beneficial uses." Code § 62.1-44.15:5(B). Beneficial use of Virginia's waters includes the preservation of instream flows for purposes of the protection of fish and wildlife resources and habitat, recreation, cultural, and aesthetic values. Id. The state permit establishes instream flow conditions, that is, "conditions that limit the volume and rate at which water may be withdrawn at certain times." 9 VAC

25-210-110(1).  See Code § 62.1-44.15:5(B).  Thus, the Board alone must insure that the reservoir's operation does not violate state water quality standards and will protect all existing beneficial uses of the waters.

The Alliance and the Tribe challenge the state permit, alleging that the Board disregarded the law and its own rules, and did not adequately protect the foregoing interests.

Therefore, under the statutory scheme, the state permit, while a condition precedent to issuance of the federal permit, has its own existence, is separate from the federal permit, and can cause injury.  The state permit is more than a mere step in the federal application process; it has a life of its own, being issued for a ten-year term and, more importantly, providing for withdrawal of up to 75 mgd from the Mattaponi.

And, by no means are the alleged injuries the result of independent action of the Corps.  The adjective "independent" means "[n]ot dependent or contingent on something else." Black's Law Dictionary 774 (7th ed. 1999).  Manifestly, the federal permit is "contingent" upon issuance of the state permit.

Moreover, no federal court or agency can review the state permit.  U.S. v. Marathon Dev. Corp., 867 F.2d 96, 102 (1st Cir. 1989) (defects in a state's § 401 certification can be redressed only in state court, rather than federal court); see Am. Rivers,

16

Inc. v. FERC, 129 F.3d 99, 110-11 (2nd Cir. 1997) (same as to federal agencies). Accordingly, Virginia state courts are the only forum in which the Alliance and the Tribe can seek redress of their injuries.

Having determined that the protesters' allegations satisfy the "causation" prong of the standing statute, we also conclude that the remaining statutory requirements have been established by the allegations. The Alliance and the Tribe plainly are "persons" who participated in the public comment process. See Code § 62.1-44.3, defining "person."

We reject the Board's contention that the Tribe sues to represent the interests of other persons and thus lacks standing to bring suit in a representative capacity. The Tribe is not claiming in a representative capacity. Rather, it possesses in its own right justiciable interests in the subject matter of the litigation, see Board of Supervisors v. Fralin & Waldron, Inc., 222 Va. 218, 223, 278 S.E.2d 859, 862 (1981), and sues through its Assistant Chief as authorized by the Tribal Council, the "governmental body" of the sovereign Tribe. See § 62.1-44.3.

And, it is unnecessary to restate the protesters' allegations to demonstrate they clearly establish the "injury in fact" prong of the statute as well as the "redressibility" prong, compliance with which the City has not challenged.

17

Finally, we have considered all the remaining arguments of the City and the Board and find them to be without merit.

Consequently, we will reverse the judgments appealed from and will remand the cases to the Court of Appeals with direction that they be remanded to the circuit court for trial upon the merits of the protesters' claims.

Record No. 000509 — <u>Reversed and remanded</u>.
Record No. 992575 — <u>Reversed and remanded</u>.
