PRESENT:  All the Justices

ALLIANCE TO SAVE THE MATTAPONI, ET AL.

v.    Record No. 042196

COMMONWEALTH OF VIRGINIA,
DEPARTMENT OF ENVIRONMENTAL QUALITY,
EX REL. STATE WATER CONTROL BOARD, ET AL.


MATTAPONI INDIAN TRIBE, ET AL.

v.   Record No. 042198                    OPINION BY
                                  JUSTICE BARBARA MILANO KEENAN
                                        November 4, 2005

COMMONWEALTH OF VIRGINIA,
DEPARTMENT OF ENVIRONMENTAL QUALITY,
EX REL. STATE WATER CONTROL BOARD, ET AL.


MATTAPONI INDIAN TRIBE, ET AL.

v.   Record No. 042826

COMMONWEALTH OF VIRGINIA,
DEPARTMENT OF ENVIRONMENTAL QUALITY,
EX REL. STATE WATER CONTROL BOARD, ET AL.



FROM THE COURT OF APPEALS OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Robert W. Curran, Judge Designate

     In this consolidated appeal, we consider questions relating

to a Virginia Water Protection Permit (the permit) issued by the

State Water Control Board (the Board) to the City of Newport

News (the City) for construction of the King William Reservoir.

     This appeal raises two distinct sets of issues.  The first

set of issues is based on an appeal from the Court of Appeals

under the Virginia Administrative Process Act (the APA), Code

§ 2.2-4000 et seq., requiring us to consider whether the Board violated any of its statutory mandates under the State Water Control Law (Water Control Law), Code § 62.1-44.2 et seq., by issuing the permit to the City.

The second set of issues, transferred to us from the Court of Appeals without decision, involves a collateral attack on the Board's action based on the 1677 Treaty at Middle Plantation (the Treaty) entered into by King Charles II and ancestors of the Mattaponi Indian Tribe (the Tribe). The Tribe contends that the Board's issuance of the permit violated certain provisions of this Treaty.

I.

FACTUAL BACKGROUND

In 1987, the City, York County, and the City of Williamsburg created the Regional Raw Water Study Group (the Regional Study Group) to examine the water supply needs of the Lower Peninsula area of southeastern Virginia. Anticipating growth in the area's population from about 400,000 residents in 1990 to about 636,000 residents in 2040, the Regional Study Group commissioned a raw water study plan to estimate future water needs. The Group projected that by 2040, the three localities would experience a water deficit of 39.8 million gallons per day (mgd).

2

The Regional Study Group identified 31 different options for providing additional water to the region. After considering these options, the Group proposed a combination of alternatives to solve the projected water deficit, including the implementation of new water conservation measures and use restrictions, the development of fresh groundwater sources, and construction of the King William Reservoir. The King William site was preferred over other potential reservoir sites for both practical and environmental reasons.

In 1993, the City, acting as the "lead" locality for the Regional Study Group, filed an application for a permit to build the King William Reservoir project (the project) in compliance with the Water Control Law and the Clean Water Act, 33 U.S.C. § 1251 et seq. (1988 & Supp. IV 1993). As finally proposed, the King William Reservoir would be located on Cohoke Creek and would employ a "pumpover" from the Mattaponi River. The project would include the construction of a 75 mgd supply intake structure and pumping station, and a 1.5-mile pipeline from Scotland Landing to the Reservoir site.

The Reservoir and dam across Cohoke Creek would create an impoundment of 1,526 acres. The project would have an additional pumping station capable of pumping 50 mgd, and also would provide a pipeline extending 11.7 miles from the King William Reservoir to Beaverdam Creek in New Kent County.

The project would supply water to consumers in the Cities of Newport News, Hampton, Poquoson, and Williamsburg, and the Counties of James City, King William, New Kent, and York. The average water withdrawal rate would be about 20 mgd.

In December 1997, the Board issued the City a permit to build the Reservoir. The Board took this action after conducting several public hearings, reviewing various environmental impact statements and scientific reports, and receiving public comments and written recommendations from both state and federal agencies.

## II.

### THE PARTIES AND THE PROCEDURAL HISTORY OF THE CASE

The Tribe and the Alliance to Save the Mattaponi were among the parties participating in the public comment process before the Board issued the permit. The Tribe is recognized by the Commonwealth of Virginia but not by the United States.[1] Of the

---

[1] Federal recognition, which can arise from legislation or Department of the Interior administrative decisions, is most commonly accomplished though a regulatory process overseen by the Office of Federal Acknowledgement in the Office of the Assistant Secretary for Indian Affairs. The Assistant Secretary makes a proposed finding regarding recognition based on staff recommendations that is subject to a period of public comment. After the staff reviews the comments, the Assistant Secretary makes his final ruling, which is subject to reconsideration by the Interior Board of Indian Appeals. 25 C.F.R. § 83.1 et seq. (2005).

Recognition by the Commonwealth of Virginia can only be accomplished through legislation. A tribe must demonstrate to the Virginia Council on Indians in the Secretariat of Natural Resources that it has met requirements substantially similar to

4

450 members enrolled in the Tribe, 65 members currently live on the Tribe's reservation, which is located along the Mattaponi River. The Tribe considers the Mattaponi River the center of its cultural heritage and the base of its spiritual identity and economic livelihood. The Tribe opposed construction of the project, asserting that it would encroach on lands bordering the Tribe's reservation and would impair the Tribe's "right to hunt, fish, and gather" secured by the Treaty.

The Alliance to Save the Mattaponi and the Sierra Club, two organizations devoted to environmental preservation, also opposed issuance of the permit. These groups submitted written comments during the administrative process, arguing that the permit application should be denied because of incomplete scientific data accompanying the application and the potential adverse environmental impact on the Mattaponi River and surrounding areas.

After the Board issued the permit, the Tribe, and a group of organizations led by the Alliance to Save the Mattaponi, filed separate petitions for appeal under the APA in the Circuit Court of the City of Newport News (the circuit court) challenging the Board's decision. The Alliance to Save the Mattaponi was joined in its petition by the Chesapeake Bay

those necessary for federal recognition. The Council then makes its recommendation to the Governor and General Assembly. Code § 2.2-2629.

Foundation, Inc., King and Queen County, the Mattaponi and Pamunkey Rivers Association, the Sierra Club, and certain individual riparian owners (collectively, the Alliance). The Alliance asserted in its petition that the Board's decision to issue the permit was made prematurely and was not supported by substantial evidence in the record.

The Alliance primarily alleged that the Board failed to consider "substantial evidence in the record relating to cultural and aesthetic instream beneficial uses; the reasonableness of the amounts of water withdrawal; and the impact of the water withdrawal, especially in relation to salinity intrusions and wetlands losses on water quality and instream beneficial uses." The Tribe's separate petition included an appeal under the APA, and other claims for injunctive and declaratory relief for alleged violations of the Treaty.

The Commonwealth and the City demurred to both petitions for appeal, asserting that the Alliance and the Tribe lacked standing under the APA to challenge the Board's decision to issue the permit and that the separate Treaty claims were multifarious, improperly pled, and failed to state a claim on which relief could be granted. The Commonwealth also asserted that the appeals were barred under the doctrine of sovereign immunity.

6

The circuit court dismissed both APA appeals, holding that they were not barred under the doctrine of sovereign immunity but that the Alliance and the Tribe lacked standing to assert those claims under the APA. The circuit court also dismissed the Tribe's separate Treaty claims on the basis that they failed to state a claim on which relief could be granted, were multifarious, and were improperly pled.

The Court of Appeals affirmed the circuit court's judgment that the Commonwealth was not immune from suit on the APA claims but that the Alliance and the Tribe lacked standing to assert those claims.[2] Mattaponi Indian Tribe v. Commonwealth, 31 Va. App. 472, 524 S.E.2d 167 (2000); Alliance to Save the Mattaponi v. Commonwealth, 30 Va. App. 690, 519 S.E.2d 413 (1999). We reversed the Court of Appeals' judgment that the Alliance and the Tribe lacked standing. Mattaponi Indian Tribe v. Commonwealth, 261 Va. 366, 541 S.E.2d 920 (2001). We concluded that they had standing to challenge the Board's decision because there was a "causal connection" between their alleged injuries and the Board's action. Id. at 376-77, 541 S.E.2d at 925. We remanded the cases for trial in the circuit court.[3] Id. at 378, 541 S.E.2d at 926.

---

[2] The Court of Appeals did not address the circuit court's holding regarding the Tribe's separate Treaty claims.

[3] Although the Commonwealth raised the issue of sovereign immunity before us, we did not directly address that issue or

7

On remand in the circuit court, the Alliance did not amend its petition.  The Tribe filed an amended petition alleging that the Board's decision to issue the permit violated Articles IV and VII of the 1677 Treaty at Middle Plantation.[4]  The Tribe also alleged that the United States was the successor-in-interest to the British Crown and that the Commonwealth was bound, as a matter of federal law, by the obligations owed to the Tribe under the Treaty.

Article IV of the Treaty provides:

> For prevention of . . . Injuries and evil consequences . . . for time to come; It is hereby Concluded and Established, That no *English* shall Seat or Plant nearer then [sic] Three miles of any *Indian* Town; and whosoever hath made, or shall make any Incroachment upon their Lands shall be removed from thence . . . .

Treaty at Middle Plantation With Tributary Indians After Bacon's Rebellion, May 29, 1677, <u>reprinted in</u> 4 Early American Indian Documents: Treaties and Laws, 1607-1789, at 83 (Alden T. Vaughan & W. Stitt Robinson, eds. 1983).

Article VII of the Treaty provides:

> That the said *Indians* have and enjoy their wonted conveniences of Oystering, Fishing, and gathering Tuchahoe, Curtenemons, Wild Oats, Rushes, Puckoone, or any thing else (for their natural support) not useful to the *English,* . . . Always provided they first

_____

the Court of Appeals' holding rejecting the Commonwealth's position on this point.

[4] The circuit court overruled the Commonwealth's and the City's objections to the Tribe's motion for leave to amend, holding that the joinder of the APA claims and the separate Treaty claims in a single chancery action was not multifarious.

> repair to some Publick Magistrate . . . who shall not
> refuse them a Certificate . . . .

1677 Treaty at Middle Plantation, 4 Early American Indian Documents, supra, at 84.

The Tribe alleged that the permit violated Article IV because the project would flood about 532 acres of land in the three-mile "buffer zone" surrounding the reservation. The Tribe further asserted that the permit violated Article VII because the Tribe's shad fishing and hatchery operation would be endangered due to the flooding of wetlands near the reservation and the alteration of the River's salinity. Additionally, citing the Water Control Law, the Tribe alleged that the Board's decision erroneously failed to consider the Tribe's Treaty rights, cultural values, and the existing beneficial uses of the River.[5]

The Commonwealth and the City filed demurrers and summary judgment motions seeking dismissal of all claims asserted by the Alliance and the Tribe. The circuit court granted the summary judgment motions, holding that the Board's decision was supported by substantial evidence in the administrative record and that the issuance of the permit did not violate any state or federal law.

---

[5] The Tribe made two additional assignments of error in the circuit court that are not before us in this appeal.

9

The circuit court also held that the separate Treaty claims were a matter of Virginia law, but that the court did not have jurisdiction to decide these issues under the terms of the Treaty. The circuit court entered final judgment approving the Board's decision and dismissing the Tribe's separate Treaty claims. The Alliance and the Tribe appealed.

After rejecting the Commonwealth's plea of sovereign immunity, the Court of Appeals affirmed the circuit court's decision on the APA claims and transferred the Tribe's separate Treaty claims to this Court. Mattaponi Indian Tribe v. Commonwealth, 43 Va. App. 690, 601 S.E.2d 667 (2004). The Court of Appeals concluded that neither the Board, nor the circuit court in its capacity as an appellate tribunal, had jurisdiction to review the Treaty claims asserted under the APA. Id. at 709-10, 601 S.E.2d at 676-77. Addressing the remaining APA claims, the Court of Appeals held that the Board acted within its discretion and that substantial evidence in the agency record supported the Board's decision. Id. at 723, 601 S.E.2d at 684. Finally, upon holding that it lacked subject matter jurisdiction to consider the Tribe's separate Treaty claims asserted under the circuit court's general equity jurisdiction, the Court of

10

Appeals transferred those claims to this Court under Code § 8.01-677.1.[6]   Id. at 710, 601 S.E.2d at 677.

The Tribe and the Alliance each filed a petition for appeal to this Court.  We granted the petitions and consolidated the cases along with the Tribe's separate Treaty claims transferred to us from the Court of Appeals.

### III.

### APA CLAIMS

#### Commonwealth's Plea of Sovereign Immunity

Before considering the merits of the parties' claims in the APA appeals, we first address the Commonwealth's motion to dismiss these appeals based on its plea of sovereign immunity.[7] Initially, the Commonwealth acknowledges that both the APA and the Water Control Law provisions of Code § 62.1-44.29 create an express waiver of the Commonwealth's immunity from suit. Nevertheless, the Commonwealth argues that Code § 2.2-4002(B)(3), which exempts from judicial review the "location, design, specifications or construction of public buildings or

---

[6] Because the Court of Appeals determined that it did not have jurisdiction over the Tribe's separate Treaty claims, the Court "express[ed] no opinion" on the issue whether the doctrine of sovereign immunity barred those claims.  Mattaponi Indian Tribe v. Commonwealth, 43 Va. App. 690, 706 n.7, 601 S.E.2d 667, 675 n.7 (2004).

[7] While the Commonwealth and the City filed joint briefs in the three cases, the City did not join the portion of the briefs asserting the Commonwealth's immunity.  Instead, the City opposed the Commonwealth's sovereign immunity defense.

11

other facilities," applies as an exception to those express waiver provisions.

The Commonwealth asserts that the Reservoir is a "public facility" within the meaning of Code § 2.2-4002, and that the Board's permit decision concerns the "location, design, specifications [and] construction" of the Reservoir. Therefore, the Commonwealth concludes, the Board's decision to issue the permit is not subject to judicial review.

We disagree with the Commonwealth's analysis of this issue. In conducting our review of the relevant statutes, we follow established principles of statutory interpretation. Courts are bound by the plain meaning of statutory language. Horner v. Dep't of Mental Health, 268 Va. 187, 192, 597 S.E.2d 202, 204 (2004); Woods v. Mendez, 265 Va. 68, 74-75, 574 S.E.2d 263, 266 (2003); Earley v. Landsidle, 257 Va. 365, 370, 514 S.E.2d 153, 155 (1999). Thus, if the language of a statute is unambiguous, courts may not interpret statutory language in a way that effectively holds that the General Assembly did not mean what it actually expressed. Horner, 268 Va. at 192, 597 S.E.2d at 204; Mozley v. Prestwould Bd. of Dirs., 264 Va. 549, 554, 570 S.E.2d 817, 820 (2002).

When one statute addresses a subject in a general manner and another addresses a part of the same subject in a more specific manner, the two statutes should be harmonized, if

12

possible, and when they conflict, the more specific statute prevails. Capelle v. Orange County, 269 Va. 60, 65, 607 S.E.2d 103, 105 (2005); Frederick County Sch. Bd. v. Hannah, 267 Va. 231, 236, 590 S.E.2d 567, 569 (2004); County of Fairfax v. Century Concrete Servs., 254 Va. 423, 427, 492 S.E.2d 648, 650 (1997).

Code § 62.1-44.29 expressly provides for judicial review of all final decisions of the Water Control Board relating to the issuance of water protection permits. Under the statute, any aggrieved owner or person participating in the public comment process related to a final decision of the Board under Code § 62.1-44.15:5 is entitled to judicial review under the APA, provided that such person also qualifies for standing under Article III of the United States Constitution. Code § 62.1-44.29.

Among the various exemptions to the provisions of the APA is Code § 2.2-4002(B)(3), which exempts from that Act review of agency actions involving the "location, design, specifications or construction of public buildings or other facilities." This statutory exemption, on its face, applies generally to agency actions relating to the development of public buildings and other facilities.

By contrast, the relevant portions of Code § 62.1-44.29 specifically address appeals of final decisions of the Board

13

issuing or denying a water protection permit, such as the appeal before us.  Notably, this statute does not remove from judicial review any final decisions of the Board involving the issuance or denial of such permits.  Instead, the statute restricts only the potential parties who may challenge such decisions by establishing standing requirements for bringing an appeal.

We also observe that judicial review of Board decisions under Code § 62.1-44.29 is not limited in scope to a review of the location, design, specifications, or construction of public facilities.  This statute provides for review of the Board's final decisions issuing or denying water protection permits, as well as review of its final decisions involving certain certificates, special orders, and other types of action that the Board is authorized to take.  See, e.g., Code § 62.1-44.15(5), (8a)-(8c).

A water protection permit, in addition to specifying the water resources infrastructures that may be built for any new project, includes many provisions regarding the alteration and withdrawal of state waters.  The terms of a permit also impose numerous mitigation requirements for the protection of water quality, water content, affected wetlands, and various natural resources.  Therefore, we conclude that Code § 62.1-44.29 provides a comprehensive mechanism for review of certain final decisions of the Board, including final decisions issuing or

14

denying water protection permits, manifesting a legislative intent to subject such decisions to review in the circuit and appellate courts of this Commonwealth. Accordingly, we hold that to the extent that these specific provisions may conflict with the general exemption provision of Code § 2.2-4002(B)(3), the more specific provisions of Code § 62.1-44.29 are controlling here.

Our conclusion in this regard also avoids the illogical consequences of the Commonwealth's contrary position. The Commonwealth's interpretation of Code § 2.2-4002(B)(3) would effectively nullify much of the judicial review procedures of Code § 62.1-44.29 by exempting from review any permit involving a project in which a "public facility" is to be constructed. In addition, the Commonwealth's position would create a conflict with the terms of the Clean Water Act, which require that each state provide a mechanism for judicial review of state administrative agency decisions issuing or denying environmental permits. See 33 U.S.C. § 1369(b)(1)(F) (2000); 40 C.F.R. § 123.30 (2005). Therefore, we hold that Code § 62.1-44.29 is an express waiver of the Commonwealth's immunity from judicial review of final decisions of the Water Control Board issuing or denying water protection permits.[8]

---

[8] Based on this holding, we do not reach the Tribe's argument that the Board's Executive Secretary would not be immune from suit even if this Court sustained the Commonwealth's

15

## Burden of Proof and Standard of Review

The Alliance and the Tribe, as the parties complaining of the Water Control Board's action, bear the burden of proving an error of law on the issues whether the Board complied with statutory authority, and whether there is substantial evidence to support the Board's decision. Code § 2.2-4027; Aegis Waste Solutions, Inc. v. Concerned Taxpayers of Brunswick County, 261 Va. 395, 403, 544 S.E.2d 660, 665 (2001); State Bd. of Health v. Godfrey, 223 Va. 423, 432-33, 290 S.E.2d 875, 879-80 (1982). Under the "substantial evidence" standard, the reviewing court may reject an agency's factual findings only when, on consideration of the entire record, a reasonable mind would necessarily reach a different conclusion. Aegis Waste Solutions, Inc., 261 Va. at 404, 544 S.E.2d at 665; Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983).

This standard is designed to give stability and finality to the factual findings of administrative agencies. Aegis Waste Solutions, Inc., 261 Va. at 404, 544 S.E.2d at 665; Bias, 226 Va. at 269, 308 S.E.2d at 125. In applying the substantial evidence standard, the reviewing court is required to take into account "the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of

plea of sovereign immunity in the present appeal under the

16

the basic law under which the agency has acted."  Code § 2.2-4027; see also Browning-Ferris Indus. of S. Atl., Inc. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 284, 492 S.E.2d 431, 434 (1997).  However, when an issue involves a pure question of statutory interpretation, that issue does not invoke the agency's specialized competence but is a question of law to be decided by the courts.  Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996); see Browning-Ferris Indus. of S. Atl, Inc., 254 Va. at 284, 492 S.E.2d at 434; Hampton Roads Sanitation Dist. Comm'n v. City of Chesapeake, 218 Va. 696, 702, 240 S.E.2d 819, 823 (1978).

### Statutory Duty to Protect Instream Beneficial Uses

The Alliance and the Tribe argue that the Board's decision violated the Water Control Law because the Board did not adequately protect existing instream beneficial uses, and that the Court of Appeals erred in approving this aspect of the Board's decision.  The Alliance and the Tribe assert that under Code § 62.1-44.15:5(B) and (C), the Board must absolutely protect existing uses, and that the Board erred by balancing existing uses against proposed uses.  They further contend that under this statute, an application for a project that will detrimentally alter any existing use of State waters, even for

---

Administrative Process Act.

17

the purpose of providing a future beneficial use of those waters, must be denied.

We reject this analysis because it effectively would prohibit the approval of most projects under the Water Control Law. Code § 62.1-44:15:5(B) authorizes the Board to "issue a [permit] if it has determined that the proposed activity is consistent with the provisions of the Clean Water Act and the State Water Control Law and will protect instream beneficial uses." Under Code § 62.1-10(b), "[i]nstream beneficial uses include, but are not limited to, the protection of fish and wildlife habitat, maintenance of waste assimilation, recreation, navigation, and cultural and aesthetic values."

The Water Control Law also requires the Board, before issuing a permit, to consult with several other State agencies regarding "the need for balancing instream uses with offstream uses." Code § 62.1-44.15:5(F). "Offstream beneficial uses include, but are not limited to, domestic (including public water supply), agricultural, electric power generation, commercial and industrial uses. Public water supply uses for human consumption shall be considered the highest priority." Code § 62.1-10(b).

These definitions and statutory directives reflect the General Assembly's recognition that the many uses of water may at times be conflicting. The Commonwealth's water policy, as

set forth in the Water Control Law, requires the Board to balance existing and proposed uses, with the directive that "[d]omestic and other existing beneficial uses shall be considered the highest priority uses."  Code § 62.1-44.15:5(C).

In addition, as we have observed, cities have the duty to protect their water supplies, and the Commonwealth's policy is to encourage every reasonable exercise of this obligation. Tidewater Ass'n of Homebuilders, Inc. v. City of Virginia Beach, 241 Va. 114, 118, 400 S.E.2d 523, 525 (1991); Board of Supervisors v. City of Norfolk, 153 Va. 768, 775, 151 S.E. 143, 145 (1930).  Therefore, in considering the City's application for a water protection permit, the Board was required to balance the various uses, and the statutory directive that the Board "protect" existing instream beneficial uses must be viewed in this context.  That directive required the Board to exercise its judgment to ensure that such uses be protected, not in an absolute sense and at the cost of rejecting any proposed future uses, but within a reasoned perspective in view of competing statutory considerations.  Such exercise of discretion and judgment is a matter plainly contemplated by the Water Control Law and the Board's special level of competency in these matters.  Therefore, we hold that the Board properly applied the statutory directive of Code § 62.1-44.15:5(C), and that the

19

Court of Appeals did not err in its interpretation of this statutory language.

APA Claims Advanced Only by the Alliance

The Alliance argues that the Court of Appeals erred in approving the Board's decision to issue the permit before obtaining additional scientific information.  The Alliance asserts that the Board should have withheld its decision until the completion of a particular study addressing wetlands losses and mitigation options, and until questions relating to changes in the River's salinity level were fully resolved.  The Alliance thus contends that the Board violated its legal duty to assure that all beneficial uses will be protected.

We find no merit in the Alliance's assertion that the Board was required to wait until these additional studies were completed before issuing the permit.  The timing of the Board's issuance of a water protection permit is a matter within the Board's discretion.  Our review is limited to determining whether the Board acted in compliance with its statutory mandates and whether its final decision was supported by substantial evidence in the administrative record at the time the decision was made.  See Code §§ 2.2-4025 and -4027.

If the Board were required to wait for the results of all potential studies before making a decision, water protection permits would be issued very rarely, if ever.  See, e.g.,

20

Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1280-81 (9th Cir. 1973) ("If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated."). Indeed, interested parties to an agency decision very often request that an agency perform additional studies or obtain additional data. Here, the Board considered several scientific studies and numerous comments submitted by environmental experts. Based on the present record, we conclude that the Board did not abuse its discretion in determining that it had sufficient information to act on the City's permit application.

With regard to the Alliance's "wetlands impacts" challenge, we conclude that the Alliance has failed to meet its burden of establishing that reasonable persons necessarily would have reached a different conclusion than that reached by the Board. Bias, 226 Va. at 269, 308 S.E.2d at 125. The Board was aware of both the project's potential effect on wetlands and its duty under Code § 62.1-44.15:5(D) to mitigate the impact on wetlands. The Board acted to compensate for the loss of wetlands by including in the permit a condition that requires the City to "creat[e] or restor[e] vegetated wetlands at a minimum of a 2:1 level of compensation."

The permit conditions specify that the City must submit a detailed wetland mitigation plan to the Department of Environmental Quality (DEQ) for its review and approval "prior to any construction that would result in the destruction of existing wetlands." The wetlands mitigation plan must include specific success criteria and a "monitoring program by which the successful creation and restoration of wetlands can be evaluated." Additionally, the permit conditions require that the City subject the mitigation plan to a public notice, a public meeting, and a comment period before the plan may be submitted to DEQ for final approval.[9] Thus, we conclude that the Board did not abuse its discretion in determining that these permit conditions will provide adequate protection for affected wetlands.

Next, we disagree with the Alliance's assertion that the one-dimensional model designed by Virginia Institute of Marine Science (the VIMS model), on which the Board relied to address potential salinity changes, was flawed. We accord particular deference to an agency's expertise in matters of scientific methodology, because the APA requires us to "take due account of the presumption of official regularity [and] the expertise and

---

[9] We also note that the Final Environmental Impact Study conducted by the Army Corps of Engineers concluded that "[a]lthough the proposed reservoir would function differently from the existing wetlands, the reservoir would have a high

22

specialized competence of the agency." Code § 2.2-4027; see

Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 244, 369 S.E.2d

1, 8 (1988) (decisions by agencies on matters within their

specialized competence are entitled to "special weight" in the

courts); see also Baltimore Gas & Elec. Co. v. Natural Res. Def.

Council, 462 U.S. 87, 103 (1983) (when examining agency's

scientific predictions and determinations, appellate court

generally must be highly deferential); Forging Indus. Ass'n v.

Secretary of Labor, 773 F.2d 1436, 1443 (4th Cir. 1985)

(application of "substantial evidence" test is particularly

deferential when agency findings are based on complex scientific

data or involve speculative projections).

We conclude that the Board did not abuse its discretion in

relying on the VIMS model to examine the potential impact of

salinity changes in the River. A report prepared by the Army

Corps of Engineers' Waterways Experiment Station (Corps' report)

analyzed the VIMS model and found that its approach was

"technically sound for assessing the environmental impact of

freshwater withdrawal from the Mattaponi River." The Corps'

report also approved the assumptions made in the VIMS model and

concluded that the model's conclusions "are adequate to address

the impact of the freshwater withdrawals." The Corps' report

disagreed with the Alliance's assertion that a multi-dimensional

---

probability of providing a number of the same functions that may

model should have been used, stating that "we do not feel that a 3D model study is required nor feasible in this study."[10]

We also hold that substantial evidence supports the Board's judgment that the project will result in only very minor salinity changes that will have no impact on fish and plant life. The Board relied on the VIMS model's conclusion that natural salinity fluctuations greatly exceeded any changes in salinity that would result from the proposed water withdrawals.

According to studies the Board considered, the minimal salinity changes resulting from the proposed withdrawals would have "little or no impact on existing wetland vegetation." These studies also concluded that the project would not impact any "threatened" plant species. Other scientific reports in the administrative record concluded that the proposed water withdrawals would not have a significant impact on the American shad and related species of fish.

Finally, we observe that the Board included a condition in the permit that requires the City to develop a plan for monitoring salinity levels. This additional protection allows

---

be lost."

[10] Although the Corps' report approved the VIMS model, the report recommended modeling an additional "cumulative effects" scenario that would account for projected withdrawals from the Pamunkey River, as well as the Mattaponi River. DEQ adopted this recommendation. The results from this supplemental "cumulative effects" study confirmed that any changes to salinity levels would be minimal and would be overwhelmed by the natural range of salinity concentrations.

the Board to modify the permit if the VIMS model's conclusion regarding salinity change is proven inaccurate.

The Alliance next argues that the Board failed to satisfy its obligation under Code § 62.1-11(E) to prevent "the waste or unreasonable use" of state waters. The Alliance identifies certain studies concluding that the City inflated its future water needs by as much as 50 percent. The Alliance contends that the results of these studies should have caused the Board to delay issuing the permit to inquire further concerning the disputed demand projections. The Alliance asserts that the Board's issuance of the permit when demand projections were uncertain was an abdication of the Board's "clear obligation" to assure that the issuance of a permit will not result in the waste or unreasonable use of state waters. We disagree with the Alliance's arguments.

Several studies conducted by the Regional Study Group, the Army Corps of Engineers, DEQ, and the Board itself all supported the need for the project. The future water deficits estimated in the Army Corps' Final Environmental Impact Statement compared favorably with the Board's own studies.[11]

DEQ independently reviewed the City's demand projections and found that they were "a little high, but not so high that

_____

[11] The Board's study predicted a 35 mgd deficit in 2030, while the Army Corps's study predicted a 39.8 mgd deficit in 2040.

25

you could call them unreasonable."  DEQ also reviewed the "Siegel Muller" study, on which the Alliance relied, and determined that the study's projections were "low."  When there are conflicting expert opinions, the administrative agency, not the courts, must resolve the factual conflicts.  Webb v. Gorsuch, 699 F.2d 157, 160 (4th Cir. 1983).  We conclude that the Board considered the conflicting views presented by the experts and made a reasonable decision supported by substantial evidence.

Additionally, we find no merit in the Alliance's argument that the Board failed to prevent the "waste or unreasonable use" of state waters by proceeding with the permit decision before obtaining additional information related to long-term water demand.  The evidence showed that large-scale water supply projects often require a minimum 20-year development period.  During this time, the need for water can greatly escalate and, therefore, it is often necessary to begin planning such projects even though long-term demand estimates cannot be made with complete precision.

### APA Claims Advanced Only by the Tribe

The Tribe argues that the Court of Appeals erred in holding that the Board did not have authority to consider the Tribe's Treaty rights before issuing the permit.  The Tribe asserts that the Board, as an agency of the Commonwealth, has a duty to

26

uphold the Commonwealth's obligations to the Tribe under the 1677 Treaty. Therefore, the Tribe contends that the Board's action was a violation of the Commonwealth's "trust" relationship with the Tribe. We disagree with the Tribe's arguments.

The Board derives its authority solely from the Water Control Law that creates and defines the Board's duties, which are set forth in Code § 62.1-44.15:5(D). These duties include the issuance or denial of water protection permits for new activities that will significantly alter or degrade existing wetland acreage or functions, or will cause permanent flooding or impoundment.

A water protection permit, like other regulatory permits, does not affect property rights or otherwise adjudicate their merits. See Zappulla v. Crown, 239 Va. 566, 571, 391 S.E.2d 65, 68 (1990). Such regulatory permits determine only the rights of an applicant with relation to the Commonwealth and the public. Id. at 570, 391 S.E.2d at 68. A water protection permit issued by the Board is a certification that an applicant's proposed activity "is consistent with the provisions of the Clean Water Act and the State Water Control Law and will protect instream beneficial uses." Code § 62.1-44.15:5(B).

The Water Control Law likewise does not authorize the Board to determine any other private rights of citizens. See Code

§ 62.1-44.22.  In conducting a public meeting or hearing under Code § 62.1-44.15:5(D), and in deciding to issue or deny a water protection permit, the Board's function is to evaluate the evidence, to make factual determinations, and to ensure that the permit complies with statutory requirements.  Accordingly, because the Water Control Law does not, and could not, authorize the Board to adjudicate any private rights, we hold that the Court of Appeals did not err in concluding that Board lacked authority to consider the Tribe's Treaty claims.

The Tribe next argues that the Board did not sufficiently consider and protect archaeological sites that will be flooded by the Reservoir.  According to the Tribe, these archaeological sites have cultural significance and the Board's failure to consider their cultural value violated the Board's statutory mandate to protect all beneficial uses of state waters.  In addition, the Tribe asserts that the Court of Appeals erred in holding that these sites are not "beneficial use[s]" within the meaning of Code § 62.1-44.15:5(C).

We first observe that Code § 62.1-44.15:5(C)[12] specifies cultural and aesthetic values as component considerations in the

---

[12] The language of Code § 62.1-44.15:5(C) provides: "The preservation of instream flows for purposes of the protection of navigation, maintenance of waste assimilation capacity, the protection of fish and wildlife resources and habitat, recreation, cultural, and aesthetic values is a beneficial use of Virginia's waters.  Conditions contained in a Virginia Water Protection Permit may include, but are not limited to, the

preservation of instream flows as beneficial uses of Virginia's waters. This subsection does not refer to archaeological sites among the various factors to be considered but focuses instead on present-day uses related to the waters, including fish and wildlife resources. The statutory references to cultural and aesthetic values must be viewed within this context, rather than isolated from the rest of the text as the Tribe asks us to do. See Turner v. Commonwealth, 226 Va. 456, 460, 309 S.E.2d 337, 339 (1983) (the maxim noscitur a sociis provides that the meaning of a word must be determined in relation to surrounding language and must be read in harmony with its context). Thus, we conclude that the archaeological sites, even though they have cultural value, are not included within the scope of the statutory factors. Accordingly, the Court of Appeals did not err in holding that these archaeological sites are not "beneficial uses" of water under the statute.

Nevertheless, contrary to the Tribe's argument, the record shows that the Board actually considered the cultural value of these archaeological sites. The Board concluded that it could not protect the affected archaeological sites while at the same time preserving instream flows of the Mattaponi River and satisfying the water supply needs of the project. The evidence

volume of water which may be withdrawn as a part of the permitted activity. Domestic and other existing beneficial uses shall be considered the highest priority uses."

29

showed that protection of the archaeological sites would require construction of a smaller reservoir, which would necessitate an increase in withdrawals from the River to satisfy projected water demands. This increase in water withdrawals would threaten instream flows. Given the competing concerns involved, we conclude that the Board's exercise of its discretion to protect instream flows was supported by substantial evidence.

The Tribe also argues that the Board failed to consider the cultural benefits the Tribe derives from its gathering, religious, and fishing uses of the River. The Tribe acknowledges that the Board imposed permit conditions that would generally protect fishing but asserts that these conditions are inadequate because they do not consider the Tribe's unique cultural uses of the Mattaponi River and do not protect the Tribe's fishing uses at specific locations.[13]

With regard to the Tribe's gathering and religious uses of the River, the Tribe merely relies on general assertions that the project would adversely affect such uses. However, the bare assertion that a project will have an adverse impact on a particular use is not a sufficient basis for a reviewing court

_____

[13] In making this argument, the Tribe refers to the Court of Appeals' statement that the Tribe's evidence on this issue crossed "the threshold of materiality" standard articulated in Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 553 (1978). See 43 Va. App. at 714-15, 601 S.E.2d at 679. We do not consider that standard, however, because it

to overturn an agency decision.  While there is some evidence in the record concerning the manner in which the Tribe uses the River for gathering and religious uses, there is no specific evidence regarding how those uses will be adversely affected. Without such evidence, the Tribe cannot meet its burden of establishing that reasonable persons would necessarily have reached a different conclusion on this issue.  Bias, 226 Va. at 269, 308 S.E.2d at 125.

Although the Tribe presented evidence that its shad fishing practices may be affected by the project, the Board relied on contrary evidence and found that any adverse affect on these fishing practices would be minimal.  The Board relied on an environmental analysis prepared by Dr. Greg C. Garman, which concluded that "there does not appear to be a substantial or scientific basis to claims of significant and detrimental impacts to migratory fish populations in the Mattaponi River, as the direct result of construction and operation of [the King William Reservoir]."

The Army Corps' Final Environmental Impact Statement similarly found that "[a]nadromous fish species should not be measurably affected by any potential changes in Mattaponi River salinity conditions caused by river withdrawals."  The VIMS model, as previously discussed, also supported this conclusion.

is inapplicable to the review of an agency decision under

31

We further observe that the Board considered the project's impact on shad spawning and attempted to protect this activity by taking steps to ensure that fish eggs do not get caught in the water intake structures, and by limiting water withdrawals during shad spawning periods. Therefore, we conclude that substantial evidence supports the Board's determination regarding the limited potential impact on the Tribe's fishing practices.

The Tribe argues, nevertheless, that even if the Board's conditions will protect fishing generally, the Board did not protect the Tribe's fishing uses at particular locations. However, the Tribe failed to present evidence showing that any particular fishing location reflects the Tribe's "unique cultural dependence" on fishing in the River. Therefore, we will not set aside the Board's factual finding that the project will not "restrict" the Tribe's right to fish.

In sum, we hold that the Court of Appeals did not err in affirming the circuit court's judgment approving the Board's decision. The record shows that the Board fulfilled its statutory mandates, did not abuse its discretion in approving certain scientific methodology or in determining to proceed with the permit decision, and reached a decision supported by substantial evidence.

_____

Virginia's APA.

IV.

THE TRIBE'S SEPARATE TREATY CLAIMS

The Tribe first argues that the circuit court erred in holding that the Treaty claims are governed by Virginia law, rather than by federal law. The Tribe observes that the United States Constitution vests treaty-making authority only in the federal government, and contends that the Constitution's Supremacy Clause adopted as federal law treaties made between Indian tribes and the British Crown. Citing <u>Worcester v. Georgia</u>, 31 U.S. 515, 560 (1832), the Tribe further contends that the United States government is the exclusive arbiter of all Indian affairs. Thus, the Tribe maintains that the Treaty provisions are enforceable as a matter of federal law, and that the doctrine of sovereign immunity does not bar the Tribe from asserting the Treaty claims against the Commonwealth.

In response, the Commonwealth agrees that the Treaty is valid but argues that the Treaty is a matter of Virginia law, rather than federal law, because the express language of the Supremacy Clause adopts as federal law only those treaties made under the authority of the United States government. The Commonwealth asserts that the Treaty was not made under such federal authority, and that the rights and obligations under the Treaty passed directly to Virginia after it declared its independence from the British Crown. The Commonwealth maintains

33

that because the Treaty is a matter of Virginia law and the Commonwealth has not waived its immunity regarding these Treaty claims, the Treaty is unenforceable against the Commonwealth.

The City agrees with the Commonwealth that the Treaty is a matter of Virginia law and implicitly acknowledges that it may not claim the total sovereign immunity of the Commonwealth. However, the City argues that the circuit court properly dismissed the Tribe's Treaty claims because the language of the Treaty makes the Governor of Virginia, not the courts, the final arbiter of claims asserted under the Treaty.

In resolving these issues, we first consider the question whether the Treaty is federal law.[14]  The Constitution gives the federal government the sole power to enter into treaties.  See U.S. Const. art. I, § 10, cl. 1.  In addition, the Supremacy Clause of the Constitution states, in relevant part: "[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.

---

[14] We agree with the Court of Appeals' conclusion that it did not have jurisdiction to consider the Tribe's separate Treaty claims.  As the Court observed, its civil appellate jurisdiction is limited by Code § 17.1-405 and includes only subject matters specified by the statute.  43 Va. App. at 710, 601 S.E.2d at 677.  Therefore, while the Court had jurisdiction under Code § 17.1-405(1) and (4) to hear the Tribe's appeal of the Board's decision under the APA, the Court lacked jurisdiction to review the Tribe's separate Treaty claims that were submitted to the circuit court's general jurisdiction.

34

We conclude that these Constitutional provisions do not support the Tribe's position.  The Supremacy Clause refers only to treaties made under the authority of the United States.  The Treaty before us was entered into in 1677, over 100 years before the Constitution was adopted in 1789.  Because the United States did not exist in 1677, manifestly, the Treaty could not have been made under the authority of the United States.  Further, the United States Congress has not ratified the Treaty pursuant to its authority under Article I, Section 10 of the Constitution.

Although the Supremacy Clause refers to "Treaties made," thereby suggesting the adoption of treaties entered into before 1789, this language plainly does not refer to treaties entered into between the British Crown, by its royal representative, and the Crown's adversaries.  Instead, the Supremacy Clause's reference to "Treaties made" signifies an adoption of treaties made during the eight years when the Articles of Confederation were in effect for the federal government.  As the United States Supreme Court observed in Reid v. Covert, 354 U.S. 1, 16-17 (1957), "the adoption of the treaty provision in Article VI make[s] it clear that the reason treaties were not limited to those made in 'pursuance' of the Constitution was so that agreements made by the United States under the Articles of Confederation . . . would remain in effect."

We also disagree with the Tribe's argument that the Treaty is federal law based on the federal government's exercise of authority over Indian affairs under Article I, Section 8, Clause 3 of the Constitution. This Constitutional provision, also known as the "Indian Commerce Clause," states in relevant part that "Congress shall have Power . . . [t]o regulate commerce . . . with the Indian Tribes."

The Indian Commerce Clause has provided a foundation for the development of a "guardian-ward" relationship between the United States and certain Indian tribes, which is governed by acts of Congress. United States v. Kagama, 118 U.S. 375, 382 (1886); see United States v. Sandoval, 231 U.S. 28, 46 (1913). In addition, federal protection is granted to all Indian tribes under "the Nonintercourse Act."[15] The present chancery suit, however, does not raise a claim involving the title or possession of any Indian lands under the Nonintercourse Act but relates only to the Tribe's rights under the Treaty.[16]

---

[15] Under "the Nonintercourse Act," which was enacted to protect Indian lands, no purchase, lease, or other conveyance of land from any Indian tribe is valid unless "made by treaty or convention entered into pursuant to the Constitution." See 25 U.S.C. § 177 (2000 & Supp. II 2002). Therefore, under this provision, before any proposed conveyance of Indian lands will be recognized as valid, both the United States government and the conveying Indian tribe must approve the conveyance.

[16] We note that although the Tribe originally asserted a claim under the Nonintercourse Act, the Tribe has abandoned that claim.

We also observe that the Tribe has not established that it has been the subject of federal legislation enacted under the federal government's "guardian-ward" relationship with various tribes. Because the Tribe has not been granted federal recognition, and has not shown that it otherwise has obtained protective legislation from the federal government based on an acknowledged guardian-ward relationship, we discern no basis for concluding that the Treaty is federal law based on such a relationship. Therefore, we hold that the text of the Constitution does not support the Tribe's contention that the Treaty is federal law.

We also find no merit in the Tribe's contention that certain decisional law of the federal courts, as exemplified by the Supreme Court's decision in Worcester, requires us to conclude that the Treaty is federal law. The Court's decision in Worcester involved treaties made with the Cherokee nation in 1785 and 1791, after independence from the British Crown and under the authority of the federal government. The Court was not asked to decide any issues under a treaty entered into by the British Crown. Therefore, the Court's statement in Worcester that the United States acquired all claims of the British Crown, both territorial and political, was merely dicta. See 31 U.S. at 551, 554-56.

We reach the same conclusion regarding the Court's statement in Worcester that the United States, by the Supremacy Clause, "has adopted and sanctioned the previous treaties with the Indian nations."  See id. at 559.  These comments are not binding precedent in the case before us because the Court was referring to treaties made after the colonies declared their independence from Great Britain.

We also observe that none of the other federal court decisions cited by the Tribe holds that Indian treaties made with the British Crown are matters of federal law.  Because those courts did not decide this question, we will not discuss their various holdings that are inapposite to the issue before us.  We simply note that many of these cases apply federal law to federal treaties, and others apply federal law to claims asserted under the Nonintercourse Act and other federal statutes.  See, e.g., Montana v. Blackfeet Tribe of Indians, 471 U.S. 759 (1985) (addressing state's power to tax Indian royalty interests arising out of leases executed after adoption of Indian Mineral Leasing Act of 1938); Oneida Indian Nation v. County of Oneida, 414 U.S. 661 (1974) (reviewing power of federal courts to hear Indian claims arising out of Nonintercourse Act); Johnson v. M'Intosh, 21 U.S. 543 (1823) (determining power of federal government to extinguish Indian title to land); Oneida Indian Nation v. New York, 860 F.2d 1145

38

(2d Cir. 1988) (construing treaties entered into by federal government after Revolution but before adoption of Constitution). Therefore, upon consideration of the Tribe's arguments, we hold that the Treaty is not federal law.

The circuit court, by its holding that Virginia law governs claims asserted under the Treaty, implicitly held that the Treaty is valid and enforceable as Virginia law. However, we are not required to decide the issue whether the Treaty is valid and enforceable Virginia law, because neither the Commonwealth nor the City has assigned cross-error to the circuit court's holding.[17] Thus, given our holding that the Treaty is not federal law, the circuit court's holding that the Tribe's Treaty claims arise under Virginia law has become the law of the case. See Commonwealth v. Luzik, 259 Va. 198, 206, 524 S.E.2d 871, 876 (2000); Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C., 258 Va. 524, 527-28, 521 S.E.2d 761, 763 (1999).

Governed by Virginia law, we now consider the Commonwealth's argument that, as sovereign, it is immune from suit on the Tribe's Treaty claims. The Tribe does not respond

---

[17] We note that the Tribe's first assignment of error states: "The Trial court erred when it held that the Tribe's claims arising under the 1677 Treaty at Middle Plantation arise under Virginia, rather than federal law." As we have discussed, the essence of the Tribe's claim under this assignment of error is that the Treaty is federal law, and that the trial court erred in failing to reach this conclusion. Therefore, we do not consider this assignment of error as including a separate assertion that Virginia law also is inapplicable.

to the Commonwealth's assertion of sovereign immunity, but separately maintains that because the Tribe sought injunctive relief against the Board's Executive Secretary, the exception provided in Ex parte Young, 209 U.S. 123 (1908), applies in this case to permit suit against him.

In resolving these issues, we first observe that the doctrine of sovereign immunity protects the Commonwealth from interference with the performance of its governmental duties and preserves the Commonwealth's ability to control its funds, properties, and instrumentalities. City of Chesapeake v. Cunningham, 268 Va. 624, 633, 604 S.E.2d 420, 426 (2004); City of Virginia Beach v. Carmichael Dev. Co., 259 Va. 493, 499, 527 S.E.2d 778, 781 (2000); Hinchey v. Ogden, 226 Va. 234, 240, 307 S.E.2d 891, 894 (1983). As a general rule, the Commonwealth is immune both from actions at law for damages and from suits in equity to restrain governmental action or to compel such action. Hinchey, 226 Va. at 239, 307 S.E.2d at 894; Virginia Bd. of Med. v. Virginia Physical Therapy Ass'n, 13 Va. App. 458, 464, 413 S.E.2d 59, 63 (1991).

Only the General Assembly, acting in its capacity of making social policy, can abrogate the Commonwealth's sovereign immunity. Luzik, 259 Va. at 206, 524 S.E.2d at 876. A waiver of sovereign immunity will not be implied from general statutory language but must be explicitly and expressly stated in the

statute.  Hinchey, 226 Va. at 241, 307 S.E.2d at 895; Elizabeth River Tunnel Dist. v. Beecher, 202 Va. 452, 457, 117 S.E.2d 685, 689 (1961); see Rector and Visitors of the University of Virginia v. Carter, 267 Va. 242, 244-45, 591 S.E.2d 76, 78 (2004).

Applying these principles, we conclude that the Commonwealth is immune from suit on the Tribe's separate Treaty claims.  The General Assembly has not waived the Commonwealth's immunity from suits of this nature and, in the absence of such an express waiver, the Commonwealth cannot be held liable on those claims.

We also hold that the Board's Executive Secretary is immune from suit.  As we explained in Messina v. Burden, 228 Va. 301, 308, 321 S.E.2d 657, 661 (1984), the purposes of the doctrine of sovereign immunity cannot be achieved by affording protection solely to the sovereign itself, because the Commonwealth can act only through its individual employees.  If every government employee were subject to suit, the Commonwealth would be as hampered in its operations as if it were the actual subject of the suit.  Id.  Thus, high-level governmental officials generally have been afforded absolute immunity.  Id. at 309, 321 S.E.2d at 661.  Here, we conclude that Robert G. Burnley, as Executive Secretary of the Water Control Board, occupies a high-

41

level governmental position that entitles him to immunity from suit in his official capacity.

Our conclusion in this regard is not altered by the Supreme Court's decision in Ex parte Young. There, the Supreme Court's holding allowed a suit against certain state officials who were sued in their official capacities for prospective injunctive relief to prevent future violations of federal law. 209 U.S. at 159-60. The rationale for the Court's decision was that state officials are not permitted to act in violation of the federal constitution. Id.

More recently, in Verizon Md., Inc. v. Public Serv. Comm'n, 535 U.S. 635, 645 (2002), the Supreme Court further explained the doctrine of Young, stating that a court need only inquire whether the complaint alleges an ongoing violation of federal law and seeks relief fairly characterized as prospective. Here, based on our holding that the Treaty is not federal law and the absence of any alleged violation of federal constitutional rights, we conclude that the remaining portions of the present suit do not allege a violation of federal law. Therefore, Burnley is not subject to suit under the doctrine of Young.

Because the Commonwealth and its agents are not subject to suit on the Tribe's separate Treaty claims, our consideration of the Tribe's second assignment of error relates only to the City, the remaining defendant in this case. In its second assignment

42

of error, the Tribe asserts that the circuit court erred when it held that it lacked jurisdiction to consider the Tribe's separate Treaty claims. In its final order, the circuit court stated that "[t]he Court does not have jurisdiction to review gubernatorial decisions concerning the 1677 Treaty at Middle Plantation."

Although the circuit court's order did not explain further this aspect of its decision, we conclude that the court was referring to the terms of the Treaty itself, which provide for recourse to "His Majesties Governour" for certain types of disputes. Article V addresses breaches and violations of the Treaty by "the English" against the Indians, stating:

> That the said *Indians* be well Secured and Defended in their Persons, Goods and Properties; against all hurts and injuries of the *English*; and that upon any breach or violation, hereof the aggrieved *Indians* do in the first place repair and Address themselves to the Governour, acquainting him therewith (without rashly and suddenly betaking themselves to any Hostile course for Satisfaction) who will Inflict such Punishment on the willful Infringers hereof, as the Laws of *England* or this Countrey permit, and as if such hurt or injury had been done to any *Englishman*; which is but just and reasonable, they owning themselves to be under the Allegiance of His most Sacred Majesty.[18]

Treaty at Middle Plantation With Tributary Indians After Bacon's Rebellion, May 29, 1677, reprinted in 4 Early

---

[18] Article XVIII addresses disputes among the various Indian tribes, "one against another," and therefore is not applicable here.

43

American Indian Documents: Treaties and Laws, 1607-1789, at
83-84 (Alden T. Vaughan & W. Stitt Robinson, eds. 1983).

Under these terms, the Indians were entitled to protection
from any "hurts and injuries of the *English*," and upon a breach
or violation of this provision, the Indians were required to "in
the first place" inform the Governor of their injuries.  The
Governor was required to respond "as the Laws of *England* or this
Countrey permit, and as if such hurt or injury had been done to
any *Englishman*."

We consider the Treaty's terms in their historical context.
At the time the Treaty was made, the Governor and his Council
exercised executive, legislative, and judicial powers.  During
this period, the General Assembly also exercised a variety of
powers, and the Governor's Council sat as the upper house of the
legislature.  George Lewis Chumbley, Colonial Justice in
Virginia: The Development of a Judicial System, Typical Laws and
Cases of the Period 3-4 (1938); see generally Legislative
Journals of the Council of Colonial Virginia in Three Volumes
(H. R. McIlwaine ed., 1918); Minutes of the Council and General
Court of Colonial Virginia, 1622-1632, 1670-1676 (H. R.
McIlwaine ed., 1924).

Because there was no separate judicial branch of government
at that time, the Treaty's direction that the Indians repair to
the Governor was simply a command that they seek a peaceful

solution under the law for any breach of their rights under the Treaty.  Moreover, the language of the Treaty itself guaranteed to the Indians the right to obtain full relief as permitted under the law.

The plain terms of Article V do not restrict the Tribe's recourse under the law but guarantee such legal recourse "as if such hurt or injury had been done to any *Englishman*." Therefore, the circuit court's holding that it lacked jurisdiction "to review gubernatorial decisions" misinterpreted the scope of the Tribe's rights under Article V and unduly restricted the court's view of its own general jurisdiction. Accordingly, we hold that the circuit court had jurisdiction to consider the Tribe's separate Treaty claims asserted against the City.

Based on our remand of these claims to the circuit court, we do not consider the City's remaining argument that the water protection permit, as a matter of law, could not violate the Tribe's Treaty rights.  The City may raise this argument in the proceedings on remand, in addition to any other defenses the City chooses to assert.

For these reasons, we will affirm the Court of Appeals' judgment in the APA appeals.  On the separate Treaty claims transferred to us from the Court of Appeals, we will affirm that portion of the circuit court's judgment holding that Virginia

law governs the Treaty, reverse the court's judgment that it lacked jurisdiction to consider the separate Treaty claims the Tribe asserts against the City, and remand those Treaty claims for further proceedings consistent with the principles expressed in this opinion.

Record No. 042196 – <u>Affirmed.</u>
Record No. 042198 – <u>Affirmed.</u>
Record No. 042826 – <u>Affirmed in part,
reversed in part,
and remanded.</u>