PRESENT:  All the Justices

RODERICK A. MORGAN, ET AL.

v.  Record No. 211021

BOARD OF SUPERVISORS
OF HANOVER COUNTY, ET AL.

OPINION BY
JUSTICE D. ARTHUR KELSEY
FEBRUARY 2, 2023

FROM THE CIRCUIT COURT OF HANOVER COUNTY
J. Overton Harris, Judge

In the circuit court, several homeowners brought an action seeking declaratory judgment and injunctive relief and claiming that the Board of Supervisors of Hanover County ("Board") violated Virginia law when it approved rezoning and special-exception requests that authorized the construction of a large distribution and warehousing facility nearby.  Dismissing the case on demurrers, the circuit court held that the homeowners did not have standing to assert their claims and that some of these claims were speculative and not ripe for adjudication.  Disagreeing with these rulings, we reverse and remand this case for further proceedings.

I.

When a court dismisses a complaint on demurrer, we assume without any corroboration that factual allegations made with "sufficient definiteness" are presumptively true.  *Squire v. Virginia Hous. Dev. Auth.*, 287 Va. 507, 514 (2014) (citation omitted).  We also credit "unstated inferences" to the extent that they are not "strained, forced, or contrary to reason."  *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641 (2021) (citation omitted).  We give no presumption of correctness, however, to "conclusions of law camouflaged as factual allegations or inferences."  *Id.* (citation omitted).  From this vantage point, we recite the alleged facts of this case as described in the original and amended complaints.

The plaintiffs are homeowners who live near the proposed distribution and warehouse facility that is the subject of the challenged rezoning decision. Kathryn Woodcock and her husband Timothy Miller reside directly across the street from the proposed development site. Sara Blose, her husband, and her young son live approximately 1,200 feet from the site. Andrea and Roderick Morgan live with their three children within 1,000 feet of the site. The original and amended complaints allege that Air Park Associates LP ("Air Park") is the record owner of the site and that Wegmans Food Markets, Inc. ("Wegmans") is a contract purchaser of the property that will construct and operate the proposed facility.[1]

The relevant history of this dispute dates back to 1995 when the Board rezoned the property at Air Park's request to "M-2 Light Industrial" subject to various proffered conditions. 2 J.A. at 746-47. It was considered a form of "speculative zoning," 1 *id.* at 492; *see also id.* at 154, because no prospective buyer had yet proposed a development plan and because the ordinance did not include a use-it-or-lose-it condition setting any deadline for development in accord with the rezoning. For 24 years thereafter, the site remained undeveloped. In 2019, Air Park agreed to sell the 217-acre site to Wegmans for the purpose of constructing and operating a 1.7 million square-foot facility to include dry and refrigerated warehouses; a return center; a food manufacturing facility; offices; parking and staging areas for tractor trailers; general parking; and ancillary support buildings for fleet maintenance, dispatch, and security services.

The Wegmans conceptual site plan, however, did not fully comply with the zoning restrictions and proffered conditions required by the 1995 rezoning ordinance. To accommodate

---

[1] The original and amended complaints refer to Wegmans as the "contract purchaser." 1 J.A. at 8; 2 *id.* at 745. On appeal, however, the parties state that Wegmans is the current owner of the property. *See* Appellants' Br. at 2; Board's Br. at 1. The closing on the sale appears to have taken place after the complaints were filed.

2

the new development plan, Air Park filed two applications with the Hanover County Planning Department.  The first application sought rezoning to change or remove various proffered conditions previously imposed by the 1995 ordinance and to add new proffered conditions.  The second application sought a special exception[2] allowing an increase in maximum building heights from the 45 feet required in an M-2 Light Industrial District to 62 feet.  Following the recommendation of the County Planning Commission, the Board heard the matter on May 6, 2020, and approved the rezoning and special-exception applications.

The homeowners filed this action challenging the legal validity of the Board's 2020 decision to approve the rezoning and special-exception applications.  The 30-page original complaint and the 26-page amended complaint assert eight theories of legal invalidity,[3] which can be summarized as follows:

- Count I claims that the Board conducted the public hearing on the applications in violation of Governor Northam's Executive Orders 53 and 55, which forbade gatherings of 10 or more individuals in any private or public setting with limited exceptions.

- Count II claims that the Board violated Code § 15.2-2204(A) by failing to notice (and ultimately to hold) a "hearing at which persons affected may appear and present their views."

- Count III alleges that the Board violated the public participation provisions of the Virginia Freedom of Information Act, Code §§ 2.2-3700 to -3715, thus rendering the Board's 2020 decision void.

---

[2] "The terms 'special exception' and 'special use permit' are interchangeable." *Board of Supervisors of Fairfax Cnty. v. Southland Corp.*, 224 Va. 514, 521 (1982) (citation omitted). "Both terms refer to the delegated power of the state to set aside certain categories of uses which are to be permitted only after being submitted to governmental scrutiny in each case, in order to [e]nsure compliance with standards designed to protect neighboring properties and the public." *Id.*

[3] Counts VI, VII, and VIII in the original complaint were dismissed with prejudice and were not repeated in the amended complaint.

3

- Count IV asserts that the Board violated Hanover County Code §§ 26-307 and -308 by approving the proposed "conceptual plan" of the new development that had not been previously made available to the public in a timely manner prior to the hearing.

- Count V asserts that the Board's 2020 decision violated Code § 15.2-2296 because the decision superseded the 1995 zoning ordinance in a manner that failed to ensure "the protection of the community." 2 J.A. at 758 (emphasis omitted).

- Count VI states that the Board approved and incorporated into its 2020 decision a conceptual plan that demonstrates that the Wegmans Distribution Center, as approved, will encroach into resource protection areas in violation of the Chesapeake Bay Preservation Act and the county ordinance implementing the Act.

- Count VII alleges that the facility "would violate the County's Noise Ordinance during [its] construction and continuous operation" based upon a "sound study" conducted by County staff. 1 *id.* at 24-25. The study "simulat[ed] the noise generated by a single tractor trailer truck's back-up beeper at 8 different locations on the property," and "7 of the 8 decibel results . . . violated the maximum decibel levels allowed on adjacent properties" under the County Noise Ordinance. *Id.*

- Count VIII alleges that the construction and operation of the facility "will constitute an unlawful nuisance" to the homeowners due to (1) "substantial increase in semi-trailer truck and other vehicular traffic congestion"; (2) "night sky light pollution caused by the increased height of Wegmans parking lot lighting"; (3) "increased noise generated by the vehicular traffic and facility operations in violation of the decibel limits established by the County's Noise Ordinance"; (4) "the permanent destruction of nontidal wetlands, unlawful encroachment" on resource protection areas, "and loss of wildlife and threatened and/or endangered plant and wildlife habitat"; and (5) "the decline in the value of their property directly caused by the proximity of their property to the construction and nuisance operation" of the facility. *Id.* at 26.

In support of their standing to assert these claims, the homeowners allege that the Wegmans Distribution Center approved by the Board's 2020 decision would have a disproportionate effect on them beyond that experienced by the public at large. They advance various likely scenarios of this particularized harm:

4

- The 24-hour, 365-days-a-year operation of the facility would bring a "substantial increase in tractor-trailer truck and other vehicular traffic congestion along the already overstressed" roads that run through their neighborhood where their "children play on a daily basis." 2 *id.* at 739. The proposed facility "will add an estimated 3,165 vehicles per day seeking ingress and egress to the proposed facility," which will include 860 additional tractor-trailer trucks per day, an average "increase of approximately 36 trucks per hour." *Id.* at 739-40.

- "[T]he substantial land disturbance caused by the Wegmans Distribution Center's construction and operation will increase flooding of the Blose property and Totopotomoy Creek where the neighborhood children, including the Blose child and Morgan children[,] often play, and which increased turbidity and flooding will negatively impact their children's ability to play in the creek." *Id.* at 740.

- The land disturbance of the site "will exacerbate the flooding and icing leading to the reasonable probability of increased accidents and creation of safety hazards" for the homeowners. *Id.* at 744-45.

- "[T]he night sky light pollution caused by the increased height of Wegmans parking lot lighting," which is "approximately double the height previously authorized for lights" under the 1995 ordinance, "will destroy the scenic beauty of the night sky and diminish the quiet use and enjoyment of their property in a manner that is different from the public generally as the general public does not live in Plaintiffs['] neighborhood and will not be affected by light pollution caused by this 24/7 Wegmans operation." *Id.* at 741.

- The increased noise from tractor-trailer back-up alarms and from the operations of the facility itself affects the homeowners because they, unlike the public at large, are directly exposed to this noise on a regular basis. *See id.* at 743-44; 1 *id.* at 24-26.

- The new proffered conditions in the Board's 2020 decision — the increased building height limits, the inferior building materials, the taller lighting poles in the parking areas, and the right (previously forbidden) to disinter and remove grave sites of former slaves in the nearby historic Brown Grove community — affect the homeowners in a manner different from the public at large. *See* 2 *id.* at 758-60.

- The removal of the 1995 proffered condition that provided for the severability of invalid conditions uniquely affects the homeowners

5

because the proffered conditions are intended to protect the community. *See id.* at 759-60.

- Given their proximity to the proposed development site, the homeowners add that the aggregate effects of the various harms will significantly reduce their property values. *See id.* at 743; 1 *id.* at 26.

In response to the original complaint, the Board filed a motion craving oyer, seeking to treat various documents as de facto exhibits to the complaint.[4] The Board followed up with a demurrer and a motion to dismiss. The lead argument was that the homeowners failed to "demonstrate they have standing to challenge the Board's decision." 2 *id.* at 659. Wegmans and Air Park filed similar demurrers and motions to dismiss but qualified their motions craving oyer as arguments "in the alternative." *Id.* at 687, 693.

Addressing the original complaint, the circuit court sustained the demurrers as to all counts with leave to amend Counts I through V. In support of its ruling, the court's letter opinion concluded that the homeowners "lack[ed] standing" to assert any of the eight counts pleaded in the complaint. *Id.* at 710, 712-15. When specifically addressing Counts VI, VII, and VIII, the court added without elaboration: "Furthermore, the alleged harm is speculative in nature and not ripe for adjudication." *Id.* at 714-15. The court granted leave to amend the complaint with respect to Counts I through V but denied leave to amend Counts VI through VIII. The court, however, declined to rule on the motions craving oyer, stating that they "are moot at

---

[4] These 25 documents involve most, if not all, of the documentary evidence of the 1995 and 2020 Board decisions to rezone the property, to accept and amend various proffered conditions, and to approve a special-exception permit. Because the circuit court did not rule on the substance of the motion craving oyer, we do not address which of the proffered documents were properly before the circuit court. *See generally Byrne v. City of Alexandria*, 298 Va. 694, 698-701 (2020).

this time." *Id.* at 715. The court thereafter entered an order incorporating by reference its letter opinion.

The homeowners later filed an amended complaint with additional details for Counts I through V. The Board, Wegmans, and Air Park responded with a second set of motions craving oyer, demurrers, and motions to dismiss. The demurrers argued that the "additional details" in the amended complaint should not change the court's original decision to deem the allegations of standing insufficient as a matter of law. *Id.* at 781. Consistent with the first set of demurrers, the second set argued in the alternative that even if the homeowners had standing, the claims asserted are legally meritless for various reasons. The court issued a second letter opinion stating that the homeowners' additional details did not alter its earlier ruling that the homeowners did not have standing to assert Counts I through V. In its final order, the court sustained the demurrers "as to the entirety" of the amended complaint and stated that it "d[id] not rule on the substance of the arguments" presented in the motions craving oyer because they were moot. *Id.* at 806.

## II.

On appeal, the homeowners argue that the allegations in the original and amended complaints, if presumed to be factually true, demonstrate that they have standing to assert their claims challenging the Board's 2020 decision on the rezoning and special-exception applications. The homeowners also claim that the circuit court erred in dismissing Counts VI through VIII as speculative and unripe for adjudication. We find both arguments persuasive.

## A.

"Standing to sue is part of the common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). In its

7

constitutional dimension, the concept of standing protects "separation-of-powers principles" and "prevent[s] the judicial process from being used to usurp the powers of the political branches." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (citation omitted). As Justice Lewis Powell aptly observed, the standing requirement thwarts "efforts to convert the Judiciary into an open forum for the resolution of political or ideological disputes about the performance of government." *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring).

As important as the standing doctrine is, it can be satisfied without the necessity of asserting a plausibly successful claim on the merits. "The concept of standing concerns itself with the characteristics of the person or entity who files suit." *Anders Larsen Tr. v. Board of Supervisors of Fairfax Cnty.*, 301 Va. 116, 120 (2022) (citation omitted). "As such, 'standing to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action.'" *McClary v. Jenkins*, 299 Va. 216, 221 (2020) (alteration and citation omitted); *see also Davis v. United States*, 564 U.S. 229, 249 n.10 (2011). This distinction, though subtle, plays an important role in the judicial process. Nearly every form of judicial relief (damages, specific performance, injunctive remedies, extraordinary writs, etc.) requires proof of a specific legal right that was infringed and that is capable of being remedied by a court. If the standing analysis simply tracked this decisional sequence on the merits, it could create an absurdity: A court would never be able to decide the merits of a claim against a claimant because that would mean the court never had jurisdiction to address the merits in the first place.

Instead, as "a preliminary jurisdictional issue," the standing doctrine asks only whether the claimant truly has "a personal stake in the outcome of the controversy." *McClary*, 299 Va. at 221-22 (citation omitted). Though not without its "peculiar relationship" exceptions, *see, e.g.*, *Lafferty v. School Bd. of Fairfax Cnty.*, 293 Va. 354, 363 (2017) (citation omitted), we have

8

applied this general rule to challenges of local zoning decisions. Focusing on two personal-stake factors, we have held:

> First, the complainant must own or occupy real property within or in close proximity to the property that is the subject of the land use determination, thus establishing that it has a direct, immediate, pecuniary, and substantial interest in the decision.

> Second, the complainant must allege facts demonstrating a particularized harm to some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally.

*Anders Larsen Tr.*, 301 Va. at 121 (quoting *Friends of the Rappahannock v. Caroline Cnty. Bd. of Supervisors*, 286 Va. 38, 48-49 (2013)); *see also Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. ___, ___, 873 S.E.2d 73, 78 (2022). We acknowledge that the imprecision of these factors necessarily requires an exercise in judicial line-drawing. Even so, as Justice Holmes once said, we should not be "troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law." *Irwin v. Gavit*, 268 U.S. 161, 168 (1925).

### B.

The homeowners contend that their allegations satisfy both personal-stake factors applicable to standing determinations in zoning challenges. They live in the neighborhood directly adjacent to the proposed development. They claim that they will suffer particularized harm in a manner different from that suffered by the public generally. The principal list of such harms includes claims of a dramatic increase in traffic to and from the Wegmans facility, including 860 additional tractor-trailer trucks per day traveling through their neighborhood; flooding that will affect one of the homeowner's properties and areas where their children play;

9

chronic, excessive noise from truck back-up alarms; and the localized effect of night-sky light pollution from the taller lighting poles to be used in the facility's parking areas.

1.

The circuit court considered each of these allegations and found them insufficient to establish standing as a matter of law. The court held that these allegations, even if assumed to be true, were no different from speculative assertions of harm that we rejected in *Friends of the Rappahannock*. We read that case differently.

In *Friends of the Rappahannock*, a local government issued a special-exception permit authorizing a sand-and-gravel mining operation. 286 Va. at 42. Nearby landowners claimed that the mining operation would interfere with their hunting, fishing, and boating activities. *Id.* Other landowners complained about dust and noise that might be produced by the mining operation. *Id.* at 42-43. The nearby landowners also believed that the mining operation might create a stagnant pond and that the site itself would ruin the scenic beauty of the area. *Id.*

Assessing those averments, we affirmed the circuit court's holding that the landowners did not have standing to contest the issuance of the special-exception permit. *Id.* at 50-51. We first observed that the mining operation generally fit within the existing industrial-use zoning for the site. Anyone seeking to engage in such mining activities, however, needed a special-exception permit that imposed conditions on specific types of mining activities. *Id.* at 49. It was on this point that the landowners' standing argument failed. We found that they "presented conclusory allegations as to possible harms" and alleged "no factual background upon which an inference can be drawn that [this] *particular* use of the property would produce such harms and thus impact the complainants." *Id.* (emphasis in original).

10

Further emphasizing the specificity point, we noted that the landowners "failed to offer *any* factual background from which to infer that the proposed mining operation would cause sufficient noise, particulate matter, or pollution *off site* to cause actual harm." *Id.* (emphases in original). The permit itself, we added, required the mining operation to "adhere to county restrictions regarding pollution, particulate matter, and noise." *Id.* at 49-50. In short, our reasoning in *Friends of the Rappahannock* did not suggest that off-site dust and noise pollution could never constitute a particularized harm to neighbors in close proximity to an industrial site. Nor did we declare that a substantial interference with hunting, fishing, and boating activities could never affect neighbors in close proximity to a degree not shared by the public at large. On both points, we merely concluded that allegations of such harm must be tied to the particular use of the property by the permittee authorized to use it.

In contrast, the original and amended complaints in the present case include specific allegations of particularized harm arising out of the Board's 2020 approval of Wegmans's development plan. The homeowners do not generalize about industrial sites in the abstract or speculate about potential harms associated with a permitted use within the general zoning classification of the property. Instead, the homeowners assert harms specific to Wegmans's intended expansion including tractor-trailer traffic on specific feeder roads surrounding the facility, the increased level of noise caused by back-up alarms from these trucks (allegedly in violation of the local noise ordinance after a sound study by County staff), anticipated flooding caused by the topography of the project, and the night-sky light pollution from taller lighting poles in the parking areas.

In zoning cases, no less than all others, allegations of standing "must be something more than an ingenious academic exercise in the conceivable." *Warth v. Seldin*, 422 U.S. 490, 509

11

(1975) (citation omitted). For standing purposes, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see also Seymour*, 301 Va. at ___, 873 S.E.2d at 78 (referring to a sufficiently likely "potential injury"). The homeowners' factual allegations in this case, when assumed to be true, satisfy this standard of likelihood of harm for purposes of standing.

2.

The Board and Wegmans[5] acknowledge these allegations but characterize them as an untimely effort to challenge the Board's 1995 decision to rezone the property to authorize industrial uses. From their perspective, most if not all of the homeowners' alleged harms are "based on zoning decisions made in 1995," Wegmans's Br. at 2; *see also* Board's Br. at 17-18, because at that time, the newly rezoned classification (M-2, Light Industrial District with conditions) permitted "a wide variety of light manufacturing, fabricating, processing, wholesale distributing, and warehousing uses" as well as "[c]ommercial uses and open storage of materials," Hanover County Code § 26-171. Wegmans could have purchased the site and developed it in 1995, the Board and Wegmans contend, and therefore the homeowners cannot challenge the Board's decision to green-light Wegmans's proposed development in 2020. In short, the Board and Wegmans argue that the homeowners have no standing in 2020 to contest

---

[5] Air Park elected not to file an appellee's brief in this appeal. The arguments before us in support of the circuit court's holding, therefore, have been asserted solely by the Board and Wegmans.

12

the actual development of the site because they should have asserted their claims in 1995.[6]  For

several reasons, however, we do not agree.

This should-have argument presupposes a could-have opportunity that did not exist.  The

1995 ordinance rezoning this site to an M-2 category with conditions authorized over 100

specific uses, including a "[b]rewery," "[f]urniture refinishing," "[g]reenhouses," and uses

permitted in several other business and industrial zoning districts, Hanover County Code § 26-

172(1), (13), (25), (27).  For all we know, the homeowners would have been happy with any of

these uses, though perhaps happier with some than others.  In this case, they are challenging the

Board's decision in 2020 to approve rezoning and special-exception applications that authorized

Wegmans to develop the property for a specific use subject to specific conditions.  No such

development plan had been on the table earlier.[7]  It is difficult to imagine that standing to

challenge this specific use would have existed 25 years before it was even arguably a reality.  To

be sure, our reasoning in *Friends of the Rappahannock* makes this very point by emphasizing

---

[6] The circuit court did not rely on this ground in its letter opinion.  The appellees raise this argument on appeal under the right-result-different-reason doctrine of appellate review. They cannot prevail on this argument, however, if it requires resolution of contested facts or consideration of disputed evidence outside the record, *see Spinner v. Commonwealth*, 297 Va. 384, 391 (2019), or matters beyond the reach of judicial notice, *see* Va. R. Evid. 2:201 to :203.

[7] In support of its right-result-different-reason argument, Wegmans asks us to review various documents that were the subject of its motion craving oyer.  One of them is the County Planning Staff Report prepared for the Board's 2020 meeting.  The report states that "[t]he original rezoning case was approved for speculative development, and no conceptual plan was provided [in 1995]."  1 J.A. at 154.  At the Board meeting, Wegmans's counsel agreed with this characterization:  "The very first proffer that we have is a conceptual plan.  *The 1995 proffers did not have a conceptual plan.*  It did not show where the buildings were going to be.  It did not show w[h]ere the entrances were going to be.  We've specifically provided for the entrances in the concept plan and specifically provided for the parking areas, the green spaces, and the building area.  That's really important because that's very specific as to what's going to be developed.  *In 1995 it was speculative zoning.  They really didn't know what was going to be out there.*  We've provided very specifics [sic] as to this user as to what's going to be out there and where it's going to be located."  *Id.* at 492 (emphases added).

13

that only a specific set of particularized harms, not a broad-spectrum list of hypothesized harms, satisfies the standing requirement. *See* 286 Va. at 48-49. The homeowners in the present case, therefore, cannot be estopped from filing their claims in 2020 for lack of standing on the theory that they should have filed them 25 years earlier.

As we see it, the timeliness challenge to standing in this case resembles a statute-of-limitations defense, which, even when successful, involves a defensive attack on a claimant's cause of action. But as noted earlier, *see supra* at 8, courts must not "conflate the threshold standing inquiry with the merits of [a litigant's] claim." *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th Cir. 2009). Whether the homeowners have asserted timely claims does not turn on standing principles but rather on the interplay between Code § 15.2-2285(F), which authorizes judicial review of certain zoning "decision[s] of the local governing body," and Hanover County Code § 26-307(j), which states that "[a]pplications for the amendment or deletion of proffered conditions previously accepted by the Board shall be considered through the same process as any other request for a zoning map amendment." We see no reason to fold this timeliness issue into our standing analysis.

Anticipating our reluctance on this issue, the Board and Wegmans stress that they are not asserting a de facto defense challenging the timeliness of the homeowners' claims. Instead, they claim that they are merely insisting upon the traditional requirement that any harms sustained by the homeowners be fairly traceable to the injury in fact that they allege. *See* Board's Br. at 18 ("Most of the harms alleged in the Complaint and Amended Complaint are traceable to the 1995 ordinance and not to the 2020 ordinances."); Wegmans's Br. at 37 ("In this case, standing can only exist for particularized harms that arise from or are causally related to the Board's May 6, 2020 decision approving the 2020 Proffers and the Special

14

Exception."). Though none of our zoning cases, including *Friends of the Rappahannock*, expressly mention this concept, we fully accept that such a causality factor has always been embedded in the standing requirement.[8]

Borrowing language from the United States Supreme Court's seminal opinion in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), we agree that standing requires particularized harm to "be fairly traceable to the challenged action of the defendant," *Mattaponi Indian Tribe v. Virginia Dep't of Env't Quality ex rel. State Water Control Bd.*, 261 Va. 366, 376 (2001); *see also Philip Morris USA Inc. v. Chesapeake Bay Found., Inc.*, 273 Va. 564, 574-75, 578-79 (2007) (applying the "fairly traceable" standard in Code § 62.1-44.29); *cf.* Code §§ 10.1-1457(B), -1318(B), 62.1-44.15:46. More flexible than traditional proximate-causation principles, the "fairly traceable" concept "does not mean that 'the defendant's actions are the very last step in the chain of causation.'" *Mattaponi Indian Tribe*, 261 Va. at 376 (citation

---

[8] *See, e.g.*, *Seymour*, 301 Va. at ___, 873 S.E.2d at 79 (finding that the plaintiffs had standing because the complaint alleged "several forms of particularized harm *arising from* the Board of Supervisors' decision" (emphasis added)); *Historic Alexandria Found. v. City of Alexandria*, 299 Va. 694, 700 (2021) (holding that there was no standing because the allegations did not allege "any form of particularized harm *resulting from* [the governing body's] decision" (emphasis added)); *Virginia Beach Beautification Comm'n v. Board of Zoning Appeals of City of Va. Beach*, 231 Va. 415, 419 (1986) (noting that "[i]n order for a petitioner to be 'aggrieved,' it must affirmatively appear that such person had some direct interest in the subject matter of the proceeding that he seeks to attack" (citation omitted)); *Cupp v. Board of Supervisors of Fairfax Cnty.*, 227 Va. 580, 590 (1984) (holding that landowners had standing to challenge zoning decision because "[t]hey had a direct stake in any ordinance that would curtail or control what they could sell in their business" and "were directly affected by any condition that would require them to turn over a portion of their land to the County"); *Board of Supervisors of Henrico Cnty. v. Fralin & Waldron, Inc.*, 222 Va. 218, 223 (1981) (holding that a land developer had standing to challenge a decision to downzone property on which the developer held options to purchase); *Knowlton v. Browning-Ferris Indus. of Va., Inc.*, 220 Va. 571, 577 (1979) (holding that the landowners did not have standing to challenge a zoning ordinance because "the alleged omission in the ordinance in no way affects [the landowners]").

15

omitted). If it did, then the standing analysis would be no different from a merits analysis that turned upon causation principles.

We have no difficulty concluding that the allegations of particularized harm made by the homeowners are fairly traceable to the Board's 2020 decision to approve Wegmans's conceptual development plan, to amend the proffered conditions in the Board's previous 1995 ordinance, and to provide a special exception to the ordinance in order to accommodate the specific requirements of this plan. Wegmans points out that it could have developed the property in 2020 pursuant to the 1995 ordinance without ever asking the Board to supersede its prior zoning ordinance with a revised set of proffers and a special exception. While true, we do not see what this point proves. Had there been no Board decision at all in 2020, there would have been no governmental decision for the homeowners to complain about. Wegmans asked for and received a favorable decision from the Board in 2020. The fairly-traceable analysis for standing applies to that decision.

3.

This conclusion applies not only to Counts V through VIII of the original complaint, which directly challenge the substance of the Board's decision, but also to Counts I through IV, which challenge the allegedly unlawful procedure used by the Board to conduct its meeting at which the decision was made. The circuit court rejected this view on the ground that, even assuming the Board's procedure was unlawful, it affected the public at large and did not target the plaintiff homeowners either intentionally or inadvertently. We agree that ground is factually true but find it legally irrelevant.

A claimant "assuredly can" seek to enforce "procedural rights" that affect the public at large "so long as the procedures in question are designed to protect some threatened concrete

16

interest of his that is the ultimate basis of his standing." *Lujan*, 504 U.S. at 573 n.8. In this context, the particularized-harm prong of standing focuses on the *effect* of the challenged conduct — not the *manner* in which it occurs. When the flawed procedure affects everyone, but the decision reached using this procedure causes particularized, "concrete" harm to some, the latter have standing to challenge the procedure, not the former. *See id*. at 573 & nn.7-8; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009).[9] It is crucial, therefore, that the alleged "procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed)," *Lujan*, 504 U.S. at 573 n.8, because without this endangerment, no litigant can protest "a procedural right in vacuo," *Summers*, 555 U.S. at 496. The few that have standing under this principle, moreover, retain it even if they cannot prove that following the proper procedure would have produced a different decision from the governing body. *See id.* at 497; *Lujan*, 504 U.S. at 573 n.7.[10]

---

[9] *See also Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016); *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767 n.8 (9th Cir. 2018); 1 Elizabeth M. Bosek et al., Cyclopedia of Federal Procedure § 2:26 (3d ed. 2015); 25 James Buchwalter et al., Federal Procedure §§ 59:8, :31 (Laws. ed. 2021); 33 Charles Alan Wright et al., Federal Practice and Procedure § 8340, at 117-18 (2d ed. 2018).

[10] *See also Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."); *Hawkins v. Haaland*, 991 F.3d 216, 225 (D.C. Cir. 2021) ("Claims for procedural violations also receive a 'relaxed redressability requirement' in which the plaintiff need only show that 'correcting the alleged procedural violation *could* still change the substantive outcome in the [plaintiff's] favor' not 'that it *would* effect such a change.'" (emphases in original) (citation omitted)); *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) ("Plaintiffs need not demonstrate that but for the procedural violation the agency action would have been different. Nor need they establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest." (citation omitted)); *South Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 330 (4th Cir. 2008) ("The party seeking an injunction need not show that injunction of the state defendant would lead directly to redress of the asserted injury, but only that relief will preserve the federal procedural remedy."); *Salmon*

17

C.

Finally, we address the circuit court's alternative ruling dismissing with prejudice Counts VI, VII, and VIII because they are "speculative in nature and not ripe for adjudication," 2 J.A. at 714-15, and thus do not satisfy the "actual controversy" requirement of the Declaratory Judgment Act, Code § 8.01-184. In one respect, this ground for decision seems indistinguishable from the standing requirement. An actual-controversy requirement protects a court from issuing an "advisory opinion" — which is an essential concern of both the standing doctrine, *Carney v. Adams*, 141 S. Ct. 493, 498 (2020), and the Declaratory Judgment Act, *Treacy v. Smithfield Foods, Inc.*, 256 Va. 97, 103-04 (1998). And while "[t]he standing question thus bears close affinity to questions of ripeness," *Warth*, 422 U.S. at 499 n.10, and gives no quarter to "speculative allegations of harm," *Seymour*, 301 Va. at ___, 873 S.E.2d at 80, these concepts are not strictly synonymous. Standing determines who may file a lawsuit — not who can win one. *See McClary*, 299 Va. at 221. Winning and losing depends on judicial factfinding and discretion. *See generally MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (observing the "unique and substantial discretion" conferred on courts to issue declaratory relief); Kent Sinclair, Virginia Remedies § 51-1[A], at 51-3 (5th ed. 2016) (surveying the "sound

---

*Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) ("Plaintiffs alleging procedural injury 'must show only that they have a procedural right that, if exercised, *could* protect their concrete interests.'" (emphasis in original) (citation omitted)); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002) ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered."). *See generally* 4 Richard Murphy & Charles H. Koch, Jr., Administrative Law and Practice § 13:12, at 297 (3d ed. 2022 Supp.); 1 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 2.13(f)(ii)(1), at 336 (5th ed. 2012); 33 Wright et al., *supra* note 9, § 8340, at 119.

judicial discretion" exercised when considering whether and to what extent to issue injunctive relief).

We need not sort out these nuances in the present appeal. As pleaded, Counts VI, VII, and VIII do not allege mere hypotheticals or conjectural situations that might possibly occur in the distant future. The homeowners assert a direct cause-and-effect relationship between the Board's 2020 decision and specific, detailed harm to the homeowners. Count VI alleges that Wegmans's conceptual development plan, as approved by the Board, will encroach into resource protection areas in violation of the Chesapeake Bay Preservation Act and the county ordinance implementing the Act. *See* 1 J.A. at 22-24.[11] Count VII alleges that the facility "would violate the County's Noise Ordinance during [its] construction and continuous operation" based upon a "sound study" conducted by County staff. *Id.* at 24-25. Count VIII alleges that the construction

---

[11] Wegmans points out that, at the time the circuit court sustained the demurrers, Wegmans had not yet submitted a final site plan for review and approval by the Virginia Department of Environmental Quality as required by Code § 62.1-44.15:74, by the Virginia Administrative Code, 9 VAC §§ 25-830-40, 25-830-60(A)(6), and by Hanover County Code §§ 26-315, -318, -319(22). Instead, Wegmans at that time had only presented a "conceptual plan" that identified the "specific development plan" that Wegmans intended to use for the site. *See* Wegmans's Br. at 34-35. The allegations in Count VI state that this plan depicts "a land disturbance of 140 acres," which "would destroy 227,023 square feet of nontidal wetlands connected by surface flow to perennial streams on and off-site." 1 J.A. at 23. According to the homeowners, the plan "approved by the Board does not depict the 100' buffer zone surrounding these protected [Resource Protection Area] nontidal wetlands as required by state law." *Id.* The homeowners also claim that the conceptual plan is "critically flawed" because it fails to accurately identify "the full extent of nontidal wetlands on the site as it was performed during an extreme drought." *Id.*

Wegmans directs our attention to related litigation pending in the Richmond Circuit Court and an interlocutory appeal related to that litigation decided by the Court of Appeals. *See* Wegmans's Br. at 35 n.24; *id.* at 9 n.11 (citing *NAACP (Hanover Cnty. Chapter) v. Commonwealth ex rel. Va. State Water Control Bd.*, 74 Va. App. 702 (2022) ("On March 1, 2021, the Virginia Department of Environmental Quality ("DEQ") issued a Virginia Water Protection (VWP) Permit to Wegmans Food Markets, Inc. to construct a distribution center in Hanover County")). We will confine our limited analysis to the allegations in Count VI of the original complaint, which the circuit court dismissed "with prejudice." 2 J.A. at 704.

and operation of the facility approved by the Board's 2020 decision "will constitute an unlawful nuisance" because of the deleterious effects of the site development, including the tractor-trailer traffic, the night-sky light pollution, the unlawful levels of noise, the impact on wetlands and wildlife, and the reduction of property values. *Id.* at 26.

Whether the homeowners can actually prove these allegations, however, is not the question before us.[12] It is sufficient for demurrer purposes that the allegations are not self-refuting and that they describe with specificity an "'actual controversy' involving an actual 'antagonistic assertion and denial of right,'" *Ames Ctr., L.C. v. SOHO Arlington, LLC*, 301 Va. ___, ___, 876 S.E.2d 344, 347 (2022) (citation omitted). For this reason, Counts VI, VII, and VIII should not have been summarily dismissed with prejudice as speculative.

With respect to the circuit court's view that these claims were "not ripe for adjudication," 2 J.A. at 714-15, the validity of this assertion depends on what the court meant. A declaratory-judgment complaint can present a sufficiently ripe "actual controversy" arising out of "'actual antagonistic assertions and denials of rights,' even though no 'consequential relief' is claimed at the time of the dispute." *Ames Ctr., L.C.*, 301 Va. at ___, 876 S.E.2d at 347 (alterations omitted) (quoting Code § 8.01-184). In this way, the Declaratory Judgment Act provides a "procedural remedy for the unripe, but legally viable, cause of action," *Cherrie v. Virginia Health Servs., Inc.*, 292 Va. 309, 318 (2016), by affording "relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade

---

[12] "A plaintiff can survive a demurrer with well-pleaded allegations of standing, but it cannot succeed thereafter without proof of standing." *Seymour*, 301 Va. at ___ n.3, 873 S.E.2d at 79 n.3. When the pleaded facts in support of standing are disputed, the contest "may be resolved at an ore tenus hearing prior to trial" or later at trial if those facts are "inextricably intertwined" with evidence presented on "intertwined merits issues." *Id.* (citation omitted).

the rights asserted by the other as to entitle him to maintain an ordinary action therefor,"

*Hoffman Fam., L.L.C. v. Mill Two Assocs. P'ship*, 259 Va. 685, 693 (2000) (quoting Code

§ 8.01-191). A declaratory-judgment action, after all, was meant to authorize the assertion of

cognizable claims before they "fully matured" and before the "alleged wrongs have . . . been

suffered." *Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va.

42, 55 (2018) (citation omitted). The Declaratory Judgment Act provides "a speedy

determination of actual controversies between citizens, and to prune, as far as is consonant with

right and justice, the dead wood attached to the common law rule of 'injury before action' and a

multitude of suits to establish a single right." *Chick v. MacBain*, 157 Va. 60, 66 (1931); *see also*

*Patterson's Ex'rs v. Patterson*, 144 Va. 113, 120 (1926).

Tested by these standards, Counts VI, VII, and VIII assert a sufficiently "ripe"

controversy for purposes of examining the case on the merits under the Declaratory Judgment

Act and declaring the rights of the parties. Whether further "consequential relief," Code § 8.01-

184, should be granted is a question to be answered by the circuit court after, not before,

declaring the rights of the parties.

III.

In sum, the circuit court erred in finding that the homeowners' pleadings did not allege a

sufficient factual basis for standing. The court also erred when it dismissed Counts VI, VII, and

VIII on the alternative ground that those Counts asserted speculative claims not ripe for

adjudication. We offer no opinion, however, on any of the merits or demerits of the various

claims pleaded by the homeowners or what, if any, judicial relief should be awarded at the

conclusion of this case.

*Reversed and remanded.*

21